CHOI & ITO

Chuck C. Choi
Email: cchoi@hibklaw.com
Allison A. Ito
Email: aito@hibklaw.com
700 Bishop Street, Suite 1107
Honolulu, Hawaii 96813
Telephone: (808) 533-1877

Proposed Local Counsel for Debtor and
Debtor-in-Possession HAWAII ISLAND
AIR, INC.

K&L GATES LLP

JEFFREY T. KUCERA
Email: jeffrey.kucera@klgates.com
Southeast Financial Center, Suite 3900
200 South Biscayne Boulevard
Miami, Florida 33131-2399

JON N. EDEL
Email: jon.edel@klgates.com
300 South Tryon Street, Suite 1000
Charlotte, North Carolina 28202

EMILY K. MATHER
Email: emily.mather@klgates.com
4350 Lassiter at North Hills Avenue
Suite 300
Raleigh, North Carolina 27609

Proposed Counsel for Debtor and
Debtor-in-Possession Wing Spirit Inc.

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| In re<br><br>WING SPIRIT INC.,<br><br>               Debtor. | Case No. 20-01383<br><br>Chapter 11 |

## DECLARATION OF TEIJIRO HANDA IN SUPPORT OF
## CHAPTER 11 PETITION, FIRST-DAY MOTIONS, AND APPLICATIONS

I, Teijiro Handa, submit this declaration (the "Declaration") pursuant to 28

U.S.C. §1746 in support of the Chapter 11 Petition, First Day Motions, and

Applications for Wing Spirit Inc. (the "Debtor" or "Wing Spirit"), and state as follows:

1.    I am the President, Chief Executive Officer, and Director of Wing Spirit, having served in such capacity since 2018. I am also the sole shareholder of KS Wing, Inc. ("KS Wing"), which is the sole shareholder of Wing Spirit. As a result, I am personally familiar with the Debtor's day-to-day operations and financial affairs and therefore am qualified to make this Declaration.

2.    I graduated from Japan Aviation Academy. After graduation, I worked as a mechanic for All Nippon Airways for approximately 10 years. I then formed FMC Inc., which was engaged in aircraft sales and related consulting. I also served as President of Air Dolphin, Inc., an operating schedule flight company, and was a director of Island Link, Inc., which operated helicopters in Okinawa,

3.    On November 29, 2020 (the "Petition Date"), the Debtor commenced the above referenced case (the "Chapter 11 Case") by filing a voluntary petition under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in this Court. The Debtor intends to operate its business and manage it assets as a debtor-in-possession under the Bankruptcy Code.

4.    To minimize the adverse effects of the Chapter 11 Case, the Debtor has prepared and filed, with the assistance of its general bankruptcy counsel, certain motions and applications discussed herein seeking "first day" relief (collectively, the "First Day Motions"). Through the First Day Motions, the Debtor seeks authority

from the Court to allow the Debtor to meet its necessary obligations and fulfill its duties as a debtor-in-possession.

5.      I am familiar with the contents of each of the First Day Motions and, to the best of my knowledge after reasonable inquiry, believe that the relief sought in each First Day Motion: (a) is necessary to enable the Debtor to enter and transition smoothly into chapter 11 with minimal disruption; (b) is critical to the Debtor's efforts to preserve value and maximize creditor and stakeholder recoveries; and (c) best serves the Debtor's estate and the interest of its creditors and stakeholders. Further, it is my belief that the relief sought in the First Day Motions is narrowly tailored and necessary to achieve the goals of this Chapter 11 Case.

6.      I submit this Declaration in support of the Debtor's (a) voluntary petition for relief filed under chapter 11 of the Bankruptcy Code; and (b) the First Day Motions, which are being filed concurrently herewith. I am knowledgeable about, and familiar with, the business  and financial affairs of the Debtor and am authorized to submit this Declaration on behalf of the Debtor.

7.      Except as otherwise indicated, the facts set forth in this Declaration are based upon my personal knowledge of the Debtor's business operations, my review of relevant business records of the Debtor, and other information provided to me or verified by other executives or employees of the Debtor under my direction and control. Unless otherwise indicated, the financial information contained in this Declaration is unaudited and, due to the exigent circumstances facing the Debtor and

the urgent need to file this Chapter 11 Case, certain of the information contained herein is subject to change. Notwithstanding, I am not aware of any information contained herein that is inaccurate.

8.      I am authorized to submit this Declaration on behalf of the Debtor, and if called upon to testify, I would testify that the facts set forth herein are true and correct.

**Preliminary Statement**

9.      The Debtor is an air charter broker, using Honda Aircraft Company, LLC ("HACI") Classic Model HA-420 Aircraft (collectively the "Aircraft"), each of which is equipped with two GE Honda Aero Engines Model HF120-H1A. The Debtor shall refer to each Aircraft using the last three digits of its serial number. The Debtor leases those aircraft from HACI through that certain Aircraft Sublease Agreement dates as of January 31, 2020 (the "Sublease"), with each aircraft being the subject of a separate Agreement Supplement.

10.     The Debtor has 44 employees, all of which are located in in Hawaii.

11.     Prior to March 2020, the Debtor's business was focused on exclusive, VIP-level inter-island transportation. Unfortunately, however, the COVID-19 pandemic and the public health measures created in response to that pandemic have rendered that business model unsustainable for the current period. To adapt, the Debtor has been focused on inter-island Medevac flights, and holds an air ambulance license to do so.

12.     At the same time, the Debtor has been in discussions with its lessor, HACI, to reach an accommodation on certain issues relating to its aircraft. For example, the Debtor's sublease contemplated that HACI would deliver 15 aircraft; that number was reduced to seven, though only four were delivered. The other three are currently not being used in the Debtor's operations because they are not in Hawaii: two aircraft are in Guam, and due to governmental restrictions are unable to leave; the third aircraft is in Lincoln, Nebraska.

13.     In addition, the structure of the Sublease and surrounding transactions have caused the Debtor additional financial distress. Originally, the Debtor intended to purchase the Aircraft directly from HACI, and made a deposit of approximately $17,500,000.00 for that purpose (the "Deposit"). At the suggestion of HACI, however, the Debtor instead entered into a series of agreements with HACI and Matterhorn Air Services, LLC ("Matterhorn"), an Irish company, whereby, among other things: (1) the Debtor assigned its rights under the purchase agreement to Matterhorn, including to $6,000,000.00 of funds from the Deposit; (2) the reminder of the deposit, less certain fees and security deposits provided to HACI for the Sublease, was then wired to the Debtor;  (3) Matterhorn executed four promissory notes in favor of the Debtor, each in the principal amount of $1,500,000.00 with a maturity date of October 31, 2020 (collectively the "Notes"); (4) an affiliate of Matterhorn, MAS One, LLC, as beneficial owner, entered into a Head Lease

agreement with HACI for the Aircraft; and (5) the Debtor entered into the Sublease with HACI.

14.     Matterhorn has failed and refused to make the payments due to the Debtor under the Notes.

15.     The Debtor faces two financial issues that can only be addressed through a Chapter 11 filing.  First, the Debtor has been unable to reach an accord with HACI regarding the Sublease and the Agreement Supplements, and HACI has threatened to terminate the Leases and de-register the Aircraft. If HACI were to do so, the Debtor would be unable to operate and would likely seek an immediate liquidation. All 44 employees would lose their jobs, and vendors would not be paid. Second, the Debtor is in dire need of financial assistance. Without an immediate infusion of cash for operations through a DIP loan, the Debtor will be unable to meet its payroll obligations and pay creditors on an ongoing basis.

16.     The Debtor is confident, however, that with the advent of a vaccine for the COVID-19 pandemic, the additional cash provided by a DIP lender, and the recovery of the amounts due under the Notes, it will be able to continue operations.

17.     To familiarize the Court with the Debtor and the relief sought in the First Day Motions filed in this chapter 11 case this Declaration is organized into four (4) parts as follows (i) Part I describes the history, business and affairs of the Debtor, its corporate structure and business operations; (ii) Part II provides an overview of the Debtor's capital structure and major leases; (iii) Part III provides a description

of the circumstances leading to the commencement of this Chapter 11 Case; and (iv) Part IV provides an overview of the relief requested in the First Day Motions and sets forth the relevant facts in connection therewith.

## PART I: THE HISTORY AND BUSINESS AFFAIRS OF THE DEBTOR

18.    The Debtor is a Hawaii based corporation focused on innovation and education in aviation. The company was incorporated on October 12, 2018.

19.    I am the sole officer or director of the Debtor.

20.    As of the Petition Date, the Debtor employed 44 full-time employees (the "Employees"). All of the Employees are salaried and are paid on a biweekly basis. The Employees perform a variety of functions critical to the Debtor's business. The Employees include flight nurses, medics, and administrative support specialists. The collective skills and experience of these Employees and their knowledge of the Debtor's operations are essential to the Debtor's ability to operate in chapter 11.

21.    The Debtor also owns three subsidiaries: Power Maintenance, Inc., Papalua Aviation, Inc., and Aviation Concepts, Inc. The Debtor is the sole customer of each of those entities, and they depend on the Debtor for operations. In the aggregate, these subsidiaries employ an additional approximately 40 people.

## PART II: THE DEBTOR'S CAPITAL STRUCTURE AND MAJOR LEASES

22.    The Debtor does not have any pre-petition secured creditor or lender that has a lien on any of the Debtor's "cash collateral" as that term is defined in Section 363 of the Bankruptcy Code.

23.     As of October 31, 2020, the debtor had assets of $20,365,870.73 and liabilities of $18,036,591.68.  For the year ended December 31, 2019, the Debtor had operating revenues of $9,374,501.69 and operating expenses of $8,316,876.29.

24.     The Debtor currently has approximately 112 trade creditors, with claims of $5,869,959.51 in the aggregate. This amount includes certain payments due under the Sublease.

25.     Pursuant to the Sublease and Agreement Supplements, the Debtor leases seven aircraft, all of which are Honda Model HA-420 with GE Honda Aero Engines, Model HF120-H1A, identified as follows:

> (a) Aircraft 073: FAA registration number N992WS, with engine numbers 3221 and 3222;
>
> (b) Aircraft 111: FAA registration number N994WS, with engine numbers 3335 and 3334;
>
> (c) Aircraft 118: FAA registration number N996WS, with engine numbers 3351 and 3352;
>
> (d) Aircraft 155: FAA registration number N191WS, with engine numbers 3423 and 3422;
>
> (e) Aircraft 156: FAA registration number N192WS, with engine numbers 3425 and 3424;
>
> (f) Aircraft 160: FAA registration number N193WS, with engine numbers 3433 and 3466; and

(g) Aircraft 161: FAA registration number N551WS, with engine numbers 3441 and 3434.

26.     For its corporate headquarters, the Debtor is party to a lease with DEG, LLC, a Delaware limited liability company. The Debtor's corporate headquarters are located at 55 Merchant Street, Honolulu.

27.     The Debtor is also a party to an agreement with the State of Hawaii Department of Transportation, Airports Division, dated March 16, 2020, for hangar space at the Daniel K. Inouye International Airport.

28.     The Debtor is also party to three leases for housing in Hilo, Lihue, and Wailuku, which are used by flight crews.

## PART III: EVENTS LEADING UP TO CHAPTER 11 CASE

29.     As noted above, Wing Spirit's bankruptcy filing was precipitated by the economic impact on the world and the airline industry specifically resulting from the accelerated spread of the Coronavirus (COVID-19) over the last several months, including the declaration of emergencies in Hawaii and ever-tightening travel restrictions that have been imposed to and from the United States and other countries. Like many companies, Wing Spirit has experienced a rapid decline in its charter business. However, Wing Spirit continues to operate Medevac flights. In addition, the actions of HACI and Matterhorn have exacerbated the Debtor's financial distress, necessitating the filing of a petition for bankruptcy protection

30.     Based on the above unprecedented circumstances, Wing Spirit's sole director determined that the filing of a Chapter 11 bankruptcy was in the best interests of Wing Spirit and all of its stakeholders. The Debtor seeks to use the Chapter 11 process to provide the necessary breathing room that it needs to weather the economic storm caused by the Coronavirus pandemic, to resolve the pending issues with HACI and Matterhorn, to right size its business so as to adjust to the current situation, and then to restructure its obligations so as to be positioned to emerge from Chapter 11 as and when the Coronavirus subsides and the global economy begins to recover. At present and for the foreseeable future, the Debtor will largely focus on its Medevac flights. Because the duration of the Coronavirus pandemic is unknown, Wing Spirit, as with all other airlines, expects demand to remain very weak for the immediate future; Wing Spirit has taken steps to balance its operations accordingly, including elimination of certain employee positions, especially within the administrative and executive teams, and to reduce spending costs.

31.     Importantly, Wing Spirit has the support of the proposed DIP Lender in the form of emergency debtor-in-possession financing as discussed below to enable it to meet its obligations during this Chapter 11 Case.

## PART IV: OVERVIEW OF FIRST DAY MOTIONS AND APPLICATIONS

32.     Contemporaneously with the filing of this Declaration, the Debtor has filed or expects to file a number of First Day Motions seeking orders granting various

forms of relief intended to stabilize the Debtor's business, facilitate the efficient administration of this Chapter 11 Case, lessen the impact of the Chapter 11 Case on the Debtor's day-to-day operations and employees, and facilitate a successful reorganization of the Debtor. I have reviewed each of the First Day Motions and proposed orders (including the exhibits thereto) and confirm that the facts set forth therein are true and correct to the best of my knowledge, information, and belief. I believe that this Court's approval of the relief requested in the First Day Pleadings is essential to avoid immediate and irreparable harm to the Debtor and its bankruptcy estate, to provide the Debtor with an opportunity to continue to meet its post-petition obligations in the ordinary course of business, to provide for a smooth transition into Chapter 11 and to provide for the efficient and swift administration of this Chapter 11 Case.

**PART IV(A): MOTION OF THE DEBTOR FOR ENTRY OF AN INTERIM ORDER (1) AUTHORIZING THE DEBTOR TO OBTAIN POST-PETITION FINANCING ON AN INTERIM BASIS, GRANTING SENIOR POSTPETITION SECURITY INTERESTS AND ACCORDING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS PURSUANT TO SECTIONS 364(c) AND 364(d) OF THE BANKRUPTCY CODE, (2) AUTHORIZING THE USE OF CASH COLLATERAL, (3) MODIFYING <u>THE AUTOMATIC STAY, AND (4) GRANTING RELATED RELIEF</u>**

33.     The Debtor requires immediate access to the Interim DIP Facility in order to sustain its operations and administer its Chapter 11 Case.  The Debtor has employees and trade creditors that depend on the Debtor to satisfy these obligations, and as noted above, the Coronavirus pandemic has stressed the Debtor's operations

and financial condition. Accordingly, the Debtor requires access to the First Interim DIP Advance during the first fourteen days of the Chapter 11 Case, or it will be forced to shutter operations.

34. With access to the Interim DIP Facility, however, the Debtor fully intends to continue satisfying its ongoing obligations on a post-petition basis. Any such cessation of meeting its obligations would force the Debtor to shut down its business and convert this case to one under chapter 7, resulting in the immediate loss of approximately 44 jobs. Further, the Debtor would be unable to restructure and continue operating as a going concern, all to the detriment of its other creditor constituencies.

35. Thus, the Debtor has an immediate need for the First Interim DIP Advance and will have a continuing need for access to the final balance of the DIP Facility during the pendency of this Chapter 11 Case.

36. Due to the Debtor's current financial condition and the impact the Coronavirus pandemic has had on the airline travel industry, the Debtor was unable to obtain post-petition financing from traditional lending sources—instead, relying on the support of the DIP Secured Lender for a future stake in the business. Due to the DIP Secured Lender and Debtor's aligned interests in seeing the Debtor continue operating, and their mutual belief that the Debtor's business will be profitable if it can weather the Coronavirus pandemic, the DIP Secured Lender has provided the

Debtor favorable terms under the Interim DIP Facility, which the Debtor does not believe it would not be able to obtain otherwise.

37.     Notwithstanding the Debtor and DIP Secured Lender's beliefs, given the Debtor's current situation and the unknown future prospects for the Debtor and the airline industry in general, the Debtor has been unable to generate interest in providing financing from other sources in this case.  Further, as explained in the First Day Declaration, the controversy surrounding the Debtor's subleases of its aircraft has precipitated this filing on an expedited basis, which has limited the Debtor's options for such traditional financing.  As such, the Interim DIP Facility as offered by the DIP Secured Lender was the best offer for post-petition financing available to the Debtor.

### PART IV(B): MOTION FOR ENTRY OF AN ORDER (A) AUTHORIZING THE MAINTENANCE OF CERTAIN BANK ACCOUNTS AND CONTINUED USE OF EXISTING BUSINESS FORMS, (B) AUTHORIZING  THE CONTINUED USE OF EXISTING CASH MANAGEMENT SYSTEM, AND (C) GRANTING LIMITED RELIEF FROM THE REQUIREMENTS OF SECTION 345(b) OF THE BANKRUPTCY CODE ("Cash Management Motion")

38.     Pursuant to the Cash Management Motion, the Debtor seeks entry of an order to maintain and continue the use of its Bank Accounts and Cash Management System, each as set forth below and in the Cash Management Motion.

39.     Prior to the Petition Date, in the ordinary course of its business, the Debtor used the Cash Management System to efficiently collect, transfer, and disburse funds generated by its business operations.  The Cash Management System

consists of eleven bank accounts (collectively, the "Bank Accounts"),[1] including five accounts at Central Pacific Bank, two accounts at First Hawaiian Bank, and four accounts at Bank of Hawaii (Central Pacific Bank, First Hawaiian Bank, and Bank of Hawaii, together, the "Banks"). All of the Bank Accounts are with authorized depositories pursuant to the *United States Trustee's Authorized Depository Listing* established for the District of Hawaii, other than Central Pacific Bank.

40. More specifically, several of the Bank Accounts serve specific functions within the Cash Management System, whereas others are dormant Bank Accounts that the Debtor anticipates closing in the future. The Bank Accounts, and their roles within the Cash Management System, are as follows:

(a) **Disbursement Account.** The centerpiece of the Debtor's Cash Management System is an account with the Bank of Hawaii ending in x1487, from which all cash disbursements are made (the, "Disbursement Account"). The Disbursement Account receives cash transfers on an "as-needed" basis from the Depository Accounts (as defined below), in order to fund disbursements to employees, vendors, suppliers, and other creditors as necessary.

(b) **Depository Accounts.** In addition to the Disbursement Account, the Debtor maintains three additional depository accounts with the Bank of Hawaii, ending in x0341, x1824, and x7539 (collectively, the "Depository Accounts"). Each of the Depository Accounts act as the main account for receipts from a different segment of the Debtor's business, with Depository Account x0341 collecting receipts related to the VIP charter business; Depository Account x1824 collecting receipts related to the air ambulance business; and Depository Account x7539 collecting receipts related to the maintenance business.

---

[1] A chart summarizing the Cash Management System and a schedule of the Bank Accounts are attached to th Cash Management Motion as Exhibits B and C, respectively.

The Depository Accounts generally hold the cash generated from operations and only transfer cash to the Disbursement Account as necessary to fund operations and render payments to creditors.

(c) **Savings Accounts.** The Debtor also maintains two savings accounts—one with Central Pacific Bank ending in x3493 and one with First Hawaiian Bank ending in x0177 (together, the "Savings Accounts"). Neither of the Savings Accounts are generally active, and the Debtor anticipates closing the Savings Account with Central Pacific Bank in the near future. The Savings accounts, on average, have a *de minimis* balance, if any.

(d) **Dormant Accounts.** Finally, the Debtor owns five other accounts that are largely dormant, but that the Debtor historically used in the operation of its business, including four accounts with Central Pacific Bank ending in x2498, x2700, x3618, and x5816 and one account with First Hawaiian Bank ending in x1877 (collectively, the "Dormant Accounts"). The Debtor anticipates closing all of the Dormant Accounts in the near future other than the Dormant Account with First Hawaiian Bank. Although the Dormant Accounts are not actively in use, the average balance per Dormant Account is approximately $2,000.

41. I believe that the Debtor's continued use of the Bank Accounts with the same account numbers and same checks is necessary for a smooth and orderly transition into Chapter 11, with minimal interference with continuing operations. I believe that requiring the Debtor to open new bank accounts and obtain new checks for those accounts will cause delay and disruption to the Debtor's businesses. The Debtor believes that its transition to chapter 11 will be more orderly, with a minimum

of harm to operations, if all of the Bank Accounts are continued following the Petition Date.

42.     By preserving the business continuity and avoiding the disruption and delay that would necessarily result from closing the Bank Accounts and opening new accounts, all parties in interest, including employees and vendors, will be best served. The benefit to the Debtor, its business operations, and all parties in interest will be considerable, while the confusion that would result absent the relief requested would ill-serve the Debtor's rehabilitative efforts. The Bank Accounts are in a financially stable institution that is insured by the Federal Deposit Insurance Corporation up to the applicable limit. Moreover, the Debtor will work with the Banks to insure that no pre-petition obligations are paid from any of the Bank Accounts unless authorized by order of the Court.

43.     In addition, I believe that the Debtor's Cash Management System constitutes an ordinary course, essential business practice providing significant benefits to the Debtor including, among other things, the ability to (i) control funds, (ii) ensure the availability of funds when necessary, and (iii) reduce costs and administrative expenses by facilitating the movement of funds and the development of more timely and accurate account balance information.

44.     I further believe that any disruption of the Cash Management System could have a severe and adverse impact upon the Debtor's' reorganization efforts. I believe the relief requested in the Cash Management Motion is vital to ensuring the

Debtor's seamless transition into bankruptcy. I believe that authorizing the Debtor to maintain their Cash Management System will avoid many of the possible disruptions and distractions that could divert the Debtor's attention from more pressing matters during the initial days of the Chapter 11 Case.

45.     Further, given the extraordinary events caused by the recent worldwide Coronavirus pandemic which has crippled the airline industry, the Debtor seeks a permitted deviation from the U.S. Trustee Guidelines ("Guidelines") to the extent that the requirements of such guidelines otherwise conflict with (a) the Debtor's continuing to use its existing Bank Accounts and the existing practices under the Cash Management System, or (b) any action taken by the Debtor in accordance with any order granting the Cash Management Motion or other order entered in the Chapter 11 Case. I believe the use of the Debtor's Cash Management System is an ordinary course, customary, essential business practice. I believe that requiring the Debtor to alter its current practices to comply with the Guidelines would risk disruption to the Debtor's businesses at this fragile time and be inefficient.

46.     I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtor's estate, its creditors, and all other parties in interest, and will enable the Debtor to continue to operate its business without interruption in chapter 11.

**PART IV(C): MOTION OF THE DEBTOR FOR AN ORDER (I) AUTHORIZING DEBTOR TO (A) PAY CERTAIN PRE-PETITION WAGES, PAYROLL TAXES, AND RELATED OBLIGATIONS, (B) PAY AND HONOR EMPLOYEE BENEFIT PROGRAMS, AND (C) CONTINUE EMPLOYEE BENEFIT PROGRAMS; AND (II) AUTHORIZING FINANCIAL INSTITUTIONS TO HONOR AND PROCESS CHECKS AND TRANSFERS RELATED TO SUCH OBLIGATIONS**

47.     On the Petition Date, the Debtor was current on its payroll obligations. However, additional net pay will become due and owing to Employees on November 30, 2020 in the amount of $147,744.50 for Employees' services during the pre-petition period from November 9, 2020 to November 24, 2020.  That amount has not been paid.   In addition, the Debtor has accrued payroll in the amount of $52,765.89 for services during the pre-petition period from November 25, 2020 to November 29, 2020 that will become due and payable on December 15, 2020.  The Debtor seeks authority to pay its Employees for services rendered pre-petition.

48.     It is also possible that certain Employees may not have cashed their payroll checks from prior pay periods as of the Petition Date, although the Debtor believes that any such checks are few in number and *de minimis* in amount.  To the extent any such checks exist, the Debtor seeks authority to honor the same.

49.     The Debtor's average aggregate biweekly compensation ("Employee Compensation") to all Employees for wages and salaries is approximately $62,786.86.  The Debtor pays its Employees on a biweekly basis on the 15th and 30th day of each month using a payroll processing company.

50. The Debtor's payroll is administered by ALTRES. ALTRES withdraws the amount needed to satisfy the Debtor's payroll obligations (including its portion of payroll taxes and other deductions, discussed below) from the Debtor's bank account. ALTRES then processes and distributes the Employee Compensation to Employees by check.

51. The Debtor estimates that the aggregate amount of accrued pre-petition wages and salaries that remained unpaid to the employees as of the Petition Date is approximately $200,510.39 (i.e., 21 days of work from November 9, 2020 through November 29, 2020), in addition to $197,628.56 in accrued PTO (as defined below).

52. In the ordinary course of business, the Debtor reimburses employees, officers, and members of its board of directors for certain expenses incurred in the discharge of their ordinary duties ("Reimbursable Expenses"). In the normal course of business, Employees or directors submit expense reports to management for approval and, if approved, are then paid by paper check. Reimbursable Expenses include expenses for travel (including meals, tickets, lodging, and automobile mileage), business supplies, clothing, cleaning expenses, and other business-related expenses. The Debtor estimates that company-related expenses paid directly by Employees prior to the Petition Date but not yet reimbursed are no more than $2,303.09, which amounts the Debtor seeks authority to pay.

53. All Employees are eligible for benefits in the form of paid time off for, among other things, vacation and sick/emergency days ("PTO," and together with

Employee Compensation and Reimbursable Expenses, the "Pre-Petition Compensation"). The amount of vacation time is based on a mathematical formula (worked hours multiplied by 0.03846) and accrues by the fifteen-day pay period.

54. As of the Petition Date, the Debtor estimates that approximately $197,628.56 of PTO in vacation pay and sick days has accrued in favor of its Employees during the pre-petition period.

55. The PTO benefits are essential features of Debtor's employment and failure to provide these benefits could harm Employees' morale, leading to departures and a disruption of the Debtor's business operations. The Debtor, therefore, requests authority to, at its sole discretion, continue honoring requests for PTO, whether accrued before or after the Petition Date, and to continue its existing practices and policies with regard to PTO for as long as the Debtor operates.

56. For each applicable biweekly pay period, the Debtor deducts certain amounts from paychecks (collectively, the "Deductions"), including, without limitation, the following: (i) garnishments for child support and similar deductions; (ii) pre-tax contributions to medical insurance, as described in detail below; and (iii) 401(k) contributions. These Deductions are processed by ALTRES.

57. As an employer, the Debtor is also required by law to withhold from an Employee's wages amounts related to, among other things, federal, state, and local income taxes, Social Security, and Medicare taxes for remittance to the appropriate federal, state, or local taxing authorities, and make payments for worker's

compensation (collectively, the "Payroll Taxes"). The Payroll Taxes are processed through ALTRES.

58. The Debtor also offers or provides Employees (and their dependents) with a variety of benefits. These employee benefits (collectively, the "Employee Benefits") include, but are not limited to: (i) health insurance; (ii) a 401(k) plan; and (iii) COBRA medical coverage. The Employee Benefits are processed through ALTRES.

59. The Debtor provides group health insurance ("Health Insurance") through two providers which Employees can choose from: Hawaii Medical Service Association ("HMSA") and Kaiser Permanente ("Kaiser," and together with HMSA, the "Health Insurance Carriers"). As of the Petition Date, Deductions for Health Insurance in the amount of $2,255.00 had not yet been remitted to the Health Insurance Carriers.

60. The Debtor is required to pay in advance for its contributions to the Health Insurance. As of the Petition Date, the Debtor was not current on the premiums owing to the Health Insurance Carriers, and owed approximately $59,058.78 to HMSA, and $4,564.07 to Kaiser.

61. The Debtor maintains a 401(k) plan (the "401(k) Plan") for the benefit of all eligible Employees after six full calendar months of work. As of the Petition Date, there are eight active participants in the 401(k) Plan. The 401(k) Plan generally allows Employees to make automatic pre-tax salary Deductions subject to

the limits set by the Internal Revenue Code (the "<u>Withholding Contributions</u>"). The Debtor has a match program whereby it matches 100% for the first 3% of Withholding Contributions, and 50% for the next 2% of Withholding Contributions. The 401(k) Plan is held in custody and administered by ALTRES on behalf of the Debtor. Withholding Contributions are transferred to ALTRES to be credited to individual Employee 401(k) accounts.

62.     Former employees are entitled to continue to participate in the Debtor's Health Insurance coverage pursuant to the Consolidated Omnibus Budget Reconciliation Act of 1986 (as amended, "<u>COBRA</u>") (such coverage, the "<u>COBRA Medical Coverage</u>"). Former Employees pay one-hundred percent (100%) of their premiums to the provider.

**PART IV(D): MOTION FOR ENTRY OF AN ORDER AUTHORIZING DEBTOR TO MAINTAIN EXISTING INSURANCE POLICIES, PAY ALL POLICY PREMIUMS ARISING THEREUNDER, AND RENEW OR ENTER INTO NEW POLICIES**

63.     In the ordinary course of its business, the Debtor maintains various insurance policies (the "<u>Insurance Policies</u>") that are administered by several third-party insurance carriers (the "<u>Insurance Carriers</u>"), which provide coverage for, *inter alia,* commercial general liability, aircraft liability, automobile liability, workers' compensation, employers' professional liability, commercial property, and employment practices. A list of the Insurance Policies is attached as **<u>Schedule 1</u>** to the proposed order attached to the Insurance Motion as **<u>Exhibit A</u>** and is

incorporated herein by reference. Continuation of the Insurance Policies is essential to the preservation of the Debtor's business. Moreover, in many cases, the coverage provided by the Insurance Policies is required by regulations, laws, and contracts that govern the Debtor's commercial activities.

64. The Debtor pays some premiums on a monthly basis and others in an annual lump sum. The Debtor is generally current on amounts owed to maintain the Insurance Policies. Certain amounts owed in connection with the Insurance Policies, however, are paid in arrears or have otherwise accrued before the Petition Date and have not yet been paid. As of the Petition Date, the Debtor estimates that a total of approximately $172,151.16 in pre-petition amounts are outstanding under the Insurance Policies. Additionally, other payments may come due in the future that relate to Insurance Policy obligations incurred pre-petition.

65. Alliant Insurance Services, Inc. (the "Broker") serves as the Debtor's insurance broker and also manages the Debtor's relationship with the Insurance Carriers. Among other things, the Broker manages the Debtor's risk management program, sources insurance policies for the Debtor at the most competitive prices, advises the Debtor on potential risk exposures, and produces certificates of insurance upon request from third parties. The Broker enables the Debtor to obtain the insurance coverage necessary to operate its business in a reasonable and prudent manner and to realize considerable savings in the procurement of such policies. The

Debtor does not pay a direct fee to the Broker. Rather, the Broker receives compensation in the form of commissions from the various Insurance Carriers.

66.     It is in the best interest of the bankruptcy estate to permit the Debtor to honor its obligations under the Insurance Policies. If the Debtor is unable to continue honoring its obligations, any one of the Insurance Carriers listed on **Schedule 1** to the proposed order may be permitted to terminate certain of the Insurance Policies to recoup their losses. Even a temporary interruption of payments would have an adverse effect on the Debtor's ability to maintain insurance coverage in the future as the Insurance Carriers may not allow the Debtor to renew the Insurance Policies at the current rates.

67.     Any alternative to allowing the Debtor to continue performing its obligations under the Insurance Policies without interruption would likely require considerable additional cash expenditures and would be detrimental to the Debtor's efforts to preserve and maximize the value of its estate.

68.     While the Debtor believes that only a minimal amount, if any, of the premiums that it seeks to pay pursuant to this Motion are pre-petition claims, immediate and irreparable harm would result if the relief sought herein is denied. The Debtor believes that if its insurance premiums are not paid as soon as possible and on an expedited basis, or otherwise as the same may become due, the Insurance Carriers may seek to terminate the Insurance Policies. The effect of potential

cancellation of the Insurance Policies would be devastating to the Debtor's estate, particularly at the early stages of the Chapter 11 Case.

**PART IV(E):MOTION FOR ENTRY OF ORDER (I) PROHIBITING UTILITIES FROM ALTERING, REFUSING, OR DISCONTINUING SERVICES ON ACCOUNT OF PRE-PETITION INVOICES, (II) APPROVING THE UTILITY DEPOSIT ACCOUNT AS ADEQUATE ASSURANCE OF PAYMENT, AND (III) ESTABLISHING PROCEDURES FOR RESOLVING REQUESTS BY UTILITY COMPANIES FOR ADDITIONAL ASSURANCE OF PAYMENT**

69.     In the ordinary course of business, the Debtor has relationships with many different utility companies and other providers (each a "Utility Company" and, collectively, the "Utility Companies") for the provision of electric, water, disposal, telephone, internet services, and similar utility products and services (collectively, the "Utility Services") at its corporate headquarters and bases.   The Utility Companies include, without limitation, the entities set forth on the list attached as **Schedule 1** to the proposed order attached to the motion as **Exhibit A**.[2]

70.     The average monthly amount owed to the Utility Companies is approximately $400.52.

71.     The Debtor has a lengthy payment history with the Utility Companies indicating consistent timely payment for Utility Services.   However, as of the

---

[2] While the Debtor has used its best efforts to list its Utility Companies in **Schedule 1** to the proposed order attached to the motion as **Exhibit A**, the Debtor may have inadvertently omitted certain Utility Companies. Accordingly, the Debtor requests that it be authorized, without further order of the Court, to amend **Schedule 1** to add any Utility Companies that were omitted therefrom and that the relief requested herein apply, subject to the below, to all such added entities. In addition, the Debtor reserves the right to argue that (a) any of the entities now or hereafter listed in **Schedule 1** is not a "utility" within the meaning of section 366 of the Bankruptcy Code and (b) any such entity is compelled by contractual obligation, state or local law, or otherwise to continue to furnish services to the Debtor notwithstanding the filing of this Chapter 11 Case.

Petition Date, the Debtor may have had (a) pre-petition accounts payable for utilities, (b) outstanding checks issued to pay pre-petition charges for utilities that had not cleared its accounts prior to the Petition Date, or (c) liabilities for pre-petition utilities that had not yet been billed.

72. The Debtor's business requires consistent Utility Services from the Utility Companies in order for the Debtor to operate its aircraft. Should any Utility Company refuse or discontinue service even for a brief period of time, operations would be disrupted, resulting in flight delays or cancellations. Any such disruption would damage customer relationships, revenues, and profits and generally would deplete the Debtor's estate. As the Debtor seeks to reorganize its operations, preservation of the bankruptcy estate is paramount. In this regard, it is in the best interest of the Debtor, the estate, and creditors of the Debtor to maintain certain, continuous, and uninterrupted utility service at the Debtor's business locations.

### PART IV(F): MOTION OF THE DEBTOR FOR AN ORDER (I) AUTHORIZING DEBTOR TO PAY CERTAIN PRE-PETITION VENDOR CLAIMS AND SECTION 503(B)(9) CLAIMS, (II) AUTHORIZING DEBTOR TO HONOR AND CONTINUE PRE-PETITION PRACTICES WITH CERTAIN <u>CRITICAL VENDORS,  AND (III) GRANTING RELATED RELIEF</u>

73. By this Motion, the Debtor seeks authority to pay, in its sole discretion and business judgment, some or all of the pre-petition obligations of certain Critical Vendors (the "Critical Vendor Claims"). The Critical Vendors are comprised primarily of the vendors that provide pilots to operate the Debtor's aircraft in the

ordinary course of the Debtor's business, vendors that provide aircraft maintenance and repair, and certain other vendors that provide goods and services critical to maintaining and operating the Debtor's business. If the relief requested is not granted, and the Critical Vendors refuse to continue offering goods and services to the Debtor post-petition, the Debtor will be unable to operate its aircraft, causing severe disruption to the Debtor's business. This disruption to the Debtor's business, which has already been significantly injured by the COVID-19 pandemic, would cause irreversible harm.

74. The Critical Vendors could not be replaced within a reasonable time and on terms as beneficial to the Debtor as those already in place. If the Debtor were forced to find replacement vendors, the effort to locate replacement vendors would be extremely disruptive and costly to the Debtor's business, and it is likely that any replacement vendors would result in higher costs and less favorable terms to the Debtor. The Debtor, and in turn the bankruptcy estate, the Debtor's creditors, and all other parties in interest, will benefit from maintaining the lower cost of goods and services from the Critical Vendors and the absence of any disruption in the provision of such goods services. Therefore, it is in the best interests of the bankruptcy estate to allow the Debtor to pay selected Critical Vendors some or all of their Critical Vendor Claims.

75. Furthermore, the preservation of the Debtor's key business relationships is essential to the Debtor's ability to reorganize and continue its

business operations, and thus, is also necessary to preserve and maximize the value of the bankruptcy estate. The irreparable harm that would result from the Critical Vendors refusing to continue offering services would far outweigh the cost of payment of the Critical Vendor Claims.

76.     The Debtor estimates that the pre-petition obligations of the Critical Vendors will not exceed $200,000.00, and therefore, requests authority to satisfy the Critical Vendor Claims in an aggregate amount not to exceed $200,000.00 (the "Vendor Cap").

77.     One of those Critical Vendors is Aviation Concepts, Inc. ("ACI"). Wing Spirit owns 25% of the voting rights and 49 shares of ACI, which holds an Air Operator Certificate and operates the charter and medevac flights for the Debtor, and provides the mechanics who maintain the Aircraft. Without the Debtor's payments, ACI will be unable to pay its pilots; if ACI then loses its pilots, the Debtor will be unable to operate. The Debtor anticipates that it will need to pay ACI approximately $177,550.28 to keep operating and intends to make such payments to ACI using proceeds from advances obtained by the Debtor through the Debtor's proposed postpetition financing facility.

## 8 U.S.C. § 1746 Declaration

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my information, knowledge, and belief.

Executed this 29th day of November, 2020 in Honolulu, Hawaii.

_____
Teijiro Handa