CHOI & ITO
Attorneys at Law

CHUCK C. CHOI
ALLISON A. ITO
Email: cchoi@hibklaw.com
Email: aito@hibklaw.com
TOPA FINANCIAL CENTER
700 Bishop Street, Suite 1107
Honolulu, Hawaii 96813
Telephone: (808) 533-1877
Facsimile:  (808) 566-6900

Proposed Attorneys for Debtor and
Debtor-in-Possession Wing Spirit Inc.

K&L Gates LLP

JEFFREY T. KUCERA
Email: jeffrey.kucera@klgates.com
Southeast Financial Center, Suite 3900
200 South Biscayne Boulevard
Miami, Florida 33131-2399

JON N. EDEL
Email: jon.edel@klgates.com
300 South Tryon Street, Suite 1000
Charlotte, North Carolina 28202

EMILY K. MATHER
Email: emily.mather@klgates.com
4350 Lassiter at North Hills Avenue
Suite 300
Raleigh, North Carolina 27609

Proposed Attorneys for Debtor and
Debtor-in-Possession Wing Spirit Inc.

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| In re | Case No. 20-01383 |
| WING SPIRIT INC., | Chapter 11 |
| Debtor and Debtor in Possession | |

**MOTION OF THE DEBTOR FOR ENTRY OF AN INTERIM ORDER
(1) AUTHORIZING THE DEBTOR TO OBTAIN POST-PETITION
FINANCING ON AN INTERIM BASIS, GRANTING SENIOR
POSTPETITION SECURITY INTERESTS AND ACCORDING
SUPERPRIORITY ADMINISTRATIVE EXPENSE
STATUS PURSUANT TO SECTIONS 364(c) AND 364(d)
OF THE BANKRUPTCY CODE, (2) AUTHORIZING
THE USE OF CASH COLLATERAL, (3) MODIFYING
THE AUTOMATIC STAY, AND (4) GRANTING
<u>RELATED RELIEF; EXHIBIT A</u>**

Wing Spirit Inc. (the "<u>Debtor</u>"), the debtor and debtor in possession in the

above-captioned chapter 11 case (the "<u>Chapter 11 Case</u>"), hereby moves

(the "<u>Motion</u>"), pursuant to sections 105, 362, 363, 364(c), 364(d), and 507 of title

11 of the United States Code (the "<u>Bankruptcy Code</u>"), Rules 2002, 4001, 6004, and

9014 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"),

and Rules 4001-2 of the Local Bankruptcy Rules for the District of Hawaii

(the "<u>Local Rules</u>"), for entry of an interim order, substantially in the form attached

hereto as **Exhibit A** (the "<u>Interim Order</u>") and, following a final hearing, a final

order, among other things[1]:

    a) authorizing the Debtor to obtain a secured post-petition interim financing
       facility (the "<u>Interim DIP Facility</u>"), in the form of a term loan in the aggregate
       amount up to $399,310.13 (plus interest, costs, fees, and other expenses and
       amounts provided for in the DIP Term Sheet (defined below) and the Interim
       Order, pursuant to the terms and conditions set forth in that certain Terms and
       Conditions of Proposed Senior Secured, Super-Priority Debtor-in-Possession
       Credit Facility, attached as **Exhibit 1** to the Interim Order (the "<u>DIP Term</u>

---

[1]     Capitalized terms used but not defined in this paragraph shall have the meanings given to them in the DIP
    Term Sheet.

U.S. Bankruptcy Court - Hawaii  #20-01383  Dkt # 5  Filed 11/30/20  Page 2 of 65

Sheet"), by and between the Debtor and HT Holdings Co. Limited (the "DIP Secured Lender");

b) authorizing the Debtor to continue negotiating the terms of a secured post-petition final financing facility (the "Final DIP Facility" and, together with the Interim DIP Facility, the "DIP Facility"), in the form of a delayed draw, multiple draw term loan in an amount (and upon terms) still to be negotiated between the Debtor and the DIP Secured Lender, which will be subject to a final order approving such facility (the "Final Order");

c) authorizing the Debtor to execute and deliver the DIP Term Sheet and to perform such other and further acts as may be required in furtherance of the Interim DIP Facility and the DIP Term Sheet;

d) authorizing the Debtor to draw on the Interim DIP Facility in an amount not to exceed the First Interim DIP Advance, subject to the conditions precedent set forth in the DIP Term Sheet, and to use proceeds of the Interim DIP Facility to pay for, among other things, working capital, general corporate purposes of the Debtor, and the expenses associated with the administration of the Chapter 11 Case, but only in accordance with the then-current Budget (attached to the Interim Order as **Exhibit 2**);

e) granting allowed superpriority administrative expense claim status in the Chapter 11 Case to the Interim DIP Facility and all obligations arising thereunder (collectively, the "DIP Obligations");

f) granting to the DIP Secured Lender automatically perfected first-priority security interests in and liens on substantially all of the property, assets, or interests in property of the Debtor and the Debtor's "estate" (as defined in the Bankruptcy Code) (collectively, the "DIP Collateral") to secure all DIP Obligations, subject to the Senior Third Party Liens (as defined in the DIP Term Sheet), and excluding Avoidance Actions but, subject to and only effective upon the entry of a Final Order granting such relief, *not* the proceeds thereof;

g) authorizing the Debtor's waiver of any right to surcharge against the DIP Collateral pursuant to Section 506(c) of the Bankruptcy Code or otherwise,

3

subject to and only effective upon the entry of a Final Order granting such relief;

h) modifying the automatic stay imposed by Section 362 of the Bankruptcy Code solely to the extent necessary to provide the DIP Secured Lender with the relief necessary to implement and effectuate the terms and provisions of the orders approving, on an interim basis, the DIP Term Sheet, and each other document or agreement prepared and executed in connection therewith (collectively, the "DIP Documents"); and

i) scheduling a final hearing (the "Final Hearing") to be held on or before December 14, 2020, to consider entry of a final order (the "Final Order") authorizing the Debtor's access additional financing not yet negotiated as part of the DIP Term Sheet and any requested relief not granted under the Interim Order on a final basis, all as set forth in this Motion and the DIP Term Sheet.

U.S. Bankruptcy Court - Hawaii   #20-01383   Dkt # 5   Filed  11/30/20   Page 4 of 65

# INTRODUCTORY STATEMENT AND
# COMPLIANCE WITH GUIDELINES FOR FINANCING STIPULATIONS[2]

| Term | Description | Location in Documents |
|---|---|---|
| Borrowing Limits | $399,310.13 | DIP Term Sheet definitions of "First Interim DIP Advance" and any further advances as agreed to by the parties |
| Interest Rate | 3.0% per annum on outstanding loans, and 2.0% per annum in excess thereof upon the occurrence of an Event of Default | DIP Term Sheet definitions of "Non-Default Interest Rate" and "Default Interest Rate" |
| Fees | Reimbursement of DIP Secured Lender's professional fees and costs, whether pre- or post-petition as set forth in the DIP Term Sheet | Interim Order ¶¶ 2, 6; DIP Term Sheet description of Fees and Expenses |
| Maturity Date | Ninety days after the Petition Date, or such other date as the DIP Secured Lender consents in writing | DIP Term Sheet definition of "Maturity Date" |
| Use of Proceeds of Post-petition Loan and Cash Collateral | Disbursement pursuant to the Budget attached to this Motion as Exhibit C; subject to the potential variance from such line items not to exceed 10% of the allotted amount | DIP Term Sheet description of "Use of Proceeds" and "Budget and Variances" |
| Security, Priority, and Adequate Protection | Consensual Priming Liens<br><br>Superpriority Administrative Claims | Interim Order ¶¶ 5–8; DIP Term Sheet description of "Collateral Security" |
| Events of Default | Events of Default include:<br><br>• Conversion to Chapter 7;<br><br>• Filing/support of a plan of reorganization that does not provide for payment of the obligations outstanding under the Interim DIP Facility (the "DIP Obligations");<br><br>• Confirmation of a plan of reorganization that does not provide for payment of the DIP Obligations;<br><br>• Appointment of a trustee without consent of the DIP Secured Lender or the filing of a motion for such appointment which the Debtor fails to timely oppose; | Interim Order ¶ 15–16; DIP Term Sheet description of "Events of Default" |

---

[2]  This chart is provided for summary purpose only, and to the extent there is any conflict between the terms included herein and those included in the DIP Term Sheet and/or the Interim Order, the DIP Term Sheet and/or Interim Order shall control.  Notwithstanding the foregoing, the Debtor and DIP Secured Lender are in the process of negotiating the terms of the Final DIP Facility, so the terms hereof are subject to change, and the Debtor reserves all rights related thereto.

U.S. Bankruptcy Court - Hawaii   #20-01383   Dkt # 5   Filed  11/30/20   Page 5 of 65

| | | |
|---|---|---|
| | • Appointment of an examiner with enlarged powers under section 1106 of the Bankruptcy Code with prior consent of the DIP Secured Lender or the filing of a motion for such appointment which the Debtor fails to timely oppose;<br><br>• Entry of an order amending, supplementing, staying, vacating, or otherwise modifying the Interim DIP Facility or the Interim or Final Order approving the DIP Facility, without prior consent of the DIP Secured Lender;<br><br>• Any attempt by the Debtor or other party in interest to obtain an order to invalidate, reduce, or impair the claims of the DIP Secured Lender or subject the DIP Collateral to surcharge under section 506(c) of the Bankruptcy Code;<br><br>• Any request by the Debtor for approval of post-petition financing other than the Interim DIP Facility that would not repay the DIP Obligations thereunder in full on the date of closing such other facility;<br><br>• Any attempt by the Debtor to obtain an order substituting any assets for a portion or all of the DIP Collateral;<br><br>• Entry of an order granting liens or claims senior to or *pari passu* with the DIP Liens;<br><br>• Any attempt by the Debtor to assert, or any determination by the Court that, the DIP Liens are invalid;<br><br>• Any payment on, or application for authority to pay, any prepetition claim owing to terminated employees or lease rejection damages without consent of the DIP Secured Lender or as set forth in the Budget;<br><br>• A final order is entered granting any creditor a with a claim greater than $25,000 relief from the automatic stay;<br><br>• Failure to make all payments under the Interim DIP Facility when due;<br><br>• Failure to pay any post-petition material indebtedness; | |

6

| | | |
|---|---|---|
| | • Breach of any covenant set forth in any DIP Financing Document;<br><br>• Any material representation or warranty by any Debtor is incorrect or misleading in any material respect when made;<br><br>• Exclusivity shall have been terminated or the Debtor has agreed to such termination; or<br><br>• The Debtor takes any action to restrict or prohibit the DIP Secured Lender from submitted a "credit bid" for any of the Debtor's assets | |
| Section 506(c) Waiver | Upon entry of a final order approving the DIP Facility, Debtor waives any right to surcharge DIP Collateral, whether under section 506(c) or 105 of the Bankruptcy Code or other applicable law<br><br>Upon entry of a final order approving the DIP Facility, DIP Secured Lender shall not be subject to the "equities-of-the-case" exception under section 552(b) of the Bankruptcy Code or other equitable doctrines of "marshaling" | Interim Order ¶ 13; DIP Term Sheet description of "506(c)/Equities of the Case" |
| Indemnification | Debtor agrees to indemnify DIP Secured Lender, its officers, directors, employees, attorneys, agents, and other representatives against all claims, damages, losses, liabilities, and expenses to which they may become liable arising out of or related to or in connection with the Interim DIP Facility, the DIP Financing Documents, or any act, event, or transaction related thereto | DIP Term Sheet description of "Indemnification" |

In support of this Motion, the Debtor respectfully represent as follows:

## JURISDICTION AND VENUE

1. The United States Bankruptcy Court for the District of Hawaii (the "Court") has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. The Motion is a core proceeding pursuant to 28 U.S.C. § 157(b).

2.     The statutory predicates for the relief requested in this Motion are sections 105, 362, 363, 364(c), 364(d), and 507 of the Bankruptcy Code; Bankruptcy Rules 2002, 4001, 6004, and 9014; and Local Rule 4001-2.

## BACKGROUND

### I.     Commencement of the Chapter 11 Case

3.     On November 29, 2020, (the "Petition Date"), the Debtor commenced the Chapter 11 Case by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code with the Court.

4.     The Debtor continues to operate its businesses as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  As of the date of this Motion, no trustee, examiner, or statutory committee has been appointed in the Chapter 11 Case.

5.     A detailed description of the Debtor and its business, and the facts and circumstances supporting this Motion, are set forth in greater detail in the *Declaration of Teijiro Handa in Support of Chapter 11 Petition, First Day Motions, and Applications* (the "First Day Declaration"), filed contemporaneously herewith and incorporated herein by reference.  Capitalized terms used but not otherwise defined in this Motion shall have the meanings provided in the First Day Declaration.

8

## II. Overview of Debt Structure

6.      The Debtor is an air charter broker. Historically, the Debtor's business was primarily focused on exclusive, VIP-level transportation between the Hawaiian Islands. Due to the Coronavirus global pandemic, however, which precipitated sweeping governmental lockdowns and travel restrictions, the Debtor's business in recent months has been primarily "medevac" trips to shuttle the sick around the Hawaiian Islands for medical care, through the Debtor's Hawaii Emergency Air Lift (HEAL) business segment.[3]

7.      ***General Unsecured Debts.*** Although the Debtor has no secured bank debt obligations, it has incurred various general unsecured debts in the course of operating its business. Nevertheless, the Debtor's third-party debt obligations outstanding as of the Petition Date comprise relatively modest debts accrued or owing to trade creditors as well as various lease and sublease obligations for aircraft, hangar space, and housing/corporate headquarters. As described further in the First Day Declaration, these unsecured obligations include approximately $5,869,959.51 owed to approximately 112 trade creditors, which amount includes obligations due under sublease covering the aircraft used by the Debtor to conduct its business.

---

[3]      Additionally, the Debtor has historically had a "maintenance segment" of the business which is not currently operating.

U.S. Bankruptcy Court - Hawaii   #20-01383   Dkt # 5   Filed   11/30/20   Page 9 of 65

8. Notwithstanding this relatively modest debt load, the Debtor has suffered financial hardship due to the continuing Coronavirus global pandemic, which has stifled the Debtor's business operations as a result of the ensuing lockdowns and travel restrictions.

## III. The Interim DIP Facility Is Critical to the Debtor's Continued Operations

9. The Debtor requires immediate access to the Interim DIP Facility in order to sustain its operations and administer its Chapter 11 Case. The Debtor has employees and trade creditors that depend on the Debtor to satisfy these obligations, and as noted above, the Coronavirus pandemic has stressed the Debtor's operations and financial condition. Accordingly, the Debtor requires access to the First Interim DIP Advance during the first fourteen days of the Chapter 11 Case, or it will be forced to shutter operations.

10. With access to the Interim DIP Facility, however, the Debtor fully intends to continue satisfying its ongoing obligations on a post-petition basis. Any such cessation of meeting its obligations would force the Debtor to shut down its business and convert this case to one under chapter 7, resulting in the immediate loss of approximately 44 jobs. Further, the Debtor would be unable to restructure and continue operating as a going concern, all to the detriment of its other creditor constituencies.

11.    Thus, the Debtor has an immediate need for the First Interim DIP Advance and will have a continuing need for access to the final balance of the DIP Facility during the pendency of this Chapter 11 Case.

## IV.    The Debtor's Decision to Obtain the Interim DIP Facility from the DIP Secured Lender

12.    As explained further in the First Day Declaration, due to the Debtor's current financial condition and the impact the Coronavirus pandemic has had on the airline travel industry, the Debtor was unable to obtain post-petition financing from traditional lending sources—instead, relying on the support of the DIP Secured Lender for a future stake in the business.  Due to the DIP Secured Lender and Debtor's aligned interests in seeing the Debtor continue operating, and their mutual belief that the Debtor's business will be profitable if it can weather the Coronavirus pandemic, the DIP Secured Lender has provided the Debtor favorable terms under the Interim DIP Facility, which the Debtor does not believe it would not be able to obtain otherwise.

13.    Notwithstanding the Debtor and DIP Secured Lender's beliefs, given the Debtor's current situation and the unknown future prospects for the Debtor and the airline industry in general, the Debtor has been unable to generate interest in providing financing from other sources in this case.  Further, as explained in the First Day Declaration, the controversy surrounding the Debtor's subleases of its aircraft has precipitated this filing on an expedited basis, which has limited the Debtor's

U.S. Bankruptcy Court - Hawaii   #20-01383   Dkt # 5   Filed  11/30/20   Page 11 of 65

options for such traditional financing. As such, the Interim DIP Facility as offered by the DIP Secured Lender was the best offer for post-petition financing available to the Debtor.

## BASIS FOR RELIEF

I.      **The Interim DIP Facility Should Be Approved under Bankruptcy Code Section 364(c) and 364(d)(1)**

14.     The Debtor needs cash to meet ongoing obligations necessary to run its business and administer its Chapter 11 Case. Pursuant to section 364(c) and 364(d)(1) of the Bankruptcy Code, the Debtor requests authority to enter into the Interim DIP Facility as an administrative expense, having priority over other administrative expenses and secured by a senior lien on substantially all of the property of the Debtor's estate, subject to Senior Third Party Liens. The Debtor is not aware of any other liens or interests in its property that exist or would be primed.

15.     Pursuant to section 364(c) of the Bankruptcy Code, a debtor may, in the exercise of business judgment, incur secured debt if the debtor has been unable to obtain unsecured credit and the borrowing is in the best interest of the estate. *See, e.g., In re Ames Dept. Stores*, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990) (reasoning, with respect to post-petition credit, courts "permit debtors-in-possession to exercise their basic business judgment consistent with their fiduciary duties"); *In re Simasko Production Co.*, 47 B.R. 444, 448–49 (D. Colo. 1985)

12

(authorizing interim financing agreement where debtor's best business judgment indicated financing was necessary and reasonable for benefit of estate).

16.    Section 364(c) of the Bankruptcy Code provides, in pertinent part, that:

> (c) If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt –
>
> > (1) with priority over any and all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;
> >
> > (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or
> >
> > (3) secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).

17.    In satisfying the standards of section 364 of the Bankruptcy Code, a debtor need not seek credit from every available source, but should make a reasonable effort to seek other sources of credit available under sections 364(a) and (b) of the Bankruptcy Code. *See, e.g., In re Republic Airways Holdings Inc.*, No. 16-10429, 2016 WL 2616717, at *10 (Bankr. S.D.N.Y. May 4, 2016) ("The debtor is not required to seek credit from every possible source but rather must demonstrate that it has made a reasonable effort to seek other sources of credit

U.S. Bankruptcy Court - Hawaii    #20-01383    Dkt # 5    Filed  11/30/20    Page 13 of 65

available under section 364(a) and (b).") (citing *In re Ames Dep't Stores*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990)) (quotation marks omitted); *In re Crouse Grp., Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (debtor seeking secured credit under section 364(c) of the Bankruptcy Code must establish that it was unable to obtain unsecured credit pursuant to section 364(b) of the Bankruptcy Code), *modified on other grounds*, 75 B.R. 553 (Bankr. E.D. Pa. 1987); *see also In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (finding that section 364(d)(1)(A) of the Bankruptcy Code had been satisfied where two banks refused to provide unsecured credit to debtor).

18.     In evaluating such a decision to enter into post-petition financing under section 364(c), courts generally defer to the business judgment of the debtor. *See Ames Dept. Stores*, 115 B.R. at 38 (reasoning, with respect to post-petition credit, courts "permit debtors-in-possession to exercise their basic business judgment consistent with their fiduciary duties"); *Simasko Production Co.*, 47 B.R. at 448–49 (authorizing interim financing agreement where debtor's best business judgment indicated financing was necessary and reasonable for benefit of estate). Accordingly, courts will not "second-guess a business decision, so long as corporate management exercised a minimum level of care in arriving at the decision." *In re Los Angeles Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011).

19.     Here, the Debtor has exercised sound business judgment in determining to enter into the Interim DIP Facility.  Although the Debtor was faced with the daunting task of filing a bankruptcy on a short timeline, the Debtor's management engaged in a fulsome review of the Debtor's liquidity position and financing options in the process of negotiating the Interim DIP Facility, including by engaging professionals to assist in the process.  At the conclusion of this process, the Debtor determined that the Interim DIP Facility was the best option to secure funding on the best terms available to enable it to commence this Chapter 11 Case and keep the business operating.  As noted above, few other options for financing were available to the Debtor, and, as such, the Interim DIP Facility provides the Debtor with the best option moving forward.  Accordingly, the Debtor submits that the decision to enter into the Interim DIP Facility was taken with good care and is the product of its sound business judgment.

20.     Further, in negotiating the terms of the Interim DIP Facility, the Debtor was constantly mindful of its liquidity concerns, abridged timeline for obtaining financing, and options available for such financing, especially considering the looming concerns of the Coronavirus pandemic and its impact on the airline industry.  As such, traditional lending options were limited.

21.     Notwithstanding the foregoing limitations, the Debtor was able to negotiate the Interim DIP Facility in large part due to the DIP Secured Lender's

desire to invest in the Debtor's business and continue owning a stake in the Debtor at the conclusion of the Chapter 11 Case. The Debtor does not have access to financing on better terms than the proposed Interim DIP Facility, as the DIP Secured Lender here is willing and has consented to accept equity in the Debtor instead of cash under a plan. The Debtor cannot obtain the financing that it requires via unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code. As such, the Interim DIP Facility represents the best terms available to the Debtor, and the Debtor negotiated the terms thereof in good faith and at arm's length with the DIP Secured Lender to ensure the fairness thereof.

22. Further, as indicated above, section 364(c) of the Bankruptcy Code enumerates certain incentives that a bankruptcy court may grant to post-petition lenders. Such incentives are not exhaustive. Bankruptcy courts frequently have authorized the use of inducements not specified in the statute. *See, e.g., Unsecured Creditors' Comm. v. First Nat'l Bank & Trust Co. (In re Ellingsen MacLean Oil Co.)*, 834 F.2d 599, 605 (6th Cir. 1987) (affirming financing order that prohibited any challenges to the validity of already existing liens); *In re Defender Drug Stores*, 126 B.R. 76, 82 (Bankr. D. Ariz. 1991) (authorizing enhancement fee to post-petition lender), *aff'd*, 145 B.R. 312, 316 (B.A.P. 9th Cir. 1992) ("Bankruptcy courts . . . have regularly authorized postpetition financial arrangements containing lender incentives beyond the explicit priorities and liens specified in section 364."); *In re*

*Antico Mfg. Co.*, 31 B.R. 103, 106 (Bankr. E.D.N.Y. 1983) (authorizing lien on prepetition collateral to secure post-petition indebtedness).

23. The Debtor proposes to grant the DIP Secured Lender certain enhancements in the form of senior liens against the Debtor's prepetition and post-petition assets, debt and security acknowledgements, indemnifications, and waivers of rights under sections 506(c) and 552 of the Bankruptcy Code. The Debtor believes that such enhancements are reasonable in return for the funding available under the Interim DIP Facility. Accordingly, the terms of the Interim DIP Facility are reasonable and adequate under the circumstances and align the interests of all parties involved to ensure the Debtor is able to complete a successful emergence from chapter 11.

24. As noted above as well as in the First Day Declaration, the Debtor is in dire need of immediate liquidity. Absent the funding provided by the Interim DIP Facility, the Debtor would be forced to cease operations and liquidate its business. With the Interim DIP Facility, however, the Debtor will be able to continue operating, stabilize its business, and emerge from the Chapter 11 Case as a going concern to the benefit of the Debtor's creditors and stakeholders. In addition, the Interim DIP Facility is essential for the Debtor to obtain credit from vendors because the existence of this facility will afford vendors a level of comfort that the Debtor will be able to pay for the goods and services that it will receive on credit.

U.S. Bankruptcy Court - Hawaii   #20-01383   Dkt # 5   Filed  11/30/20   Page 17 of 65

As such, authorizing the Debtor to obtain post-petition financing under the Interim DIP Facility is necessary to enable to the Debtor to continue operating and is in the best interest of the Debtor, its estate, and its creditors.

25.    In short, the Debtor respectfully submits that the Interim DIP Facility satisfies section 364(c) and (d) of the Bankruptcy Code, as it provides credit to the Debtor on the best terms available.  Accordingly, the Debtor believes that it is fair, reasonable, and necessary for the Court to approve the Interim DIP Facility and enter the Interim Order (and, subsequent to the Final Hearing, the Final Order).  In addition to representing the best terms presently available to Debtor, the Interim DIP Facility is also in the best interests of the Debtor's estate, as it will provide the Debtor required funding in order for the Debtor to maintain and operate its business and administer the Chapter 11 Case.  Without the Interim DIP Facility, the Debtor will likely be forced to terminate its operations and liquidate its assets, which will be to the detriment of its various stakeholders.  The Interim DIP Facility therefore is plainly in the best interests of Debtor's estate.

26.    Based on the foregoing, the DIP Secured Lender should be accorded the benefits of section 364(e) of the Bankruptcy Code in respect of the Interim DIP Facility, because the DIP Secured Lender has offered to extend such financing to the Debtor in good faith.  Further, section 364(e) provides a lender with a presumption of good faith.  *Burchinal v. Cent. Wash. Bank (In re Adams Apple,*

U.S. Bankruptcy Court - Hawaii   #20-01383   Dkt # 5   Filed  11/30/20   Page 18 of 65

*Inc.),* 829 F.2d 1484, 1488 (9th Cir. 1987) ("[T]he purpose of section 364(e) was to overcome a good faith lender's reluctance to extend financing in a bankruptcy context by permitting reliance on a bankruptcy judge's authorization.").

## INTERIM ORDER AND FINAL HEARING

27.     Pursuant to Bankruptcy Rule 4001(b)(2) and (c)(2) and Local Rule 4001-2(d), the Debtor requests that the Court enter the Interim Order to prevent immediate and irreparable harm to the estate pending a final hearing and set a date for the Final Hearing within fourteen days of the Petition Date.  The Debtor intends for the Final Order to be in substantially the same form as the Interim Order and will submit a proposed form no later than two days prior to the Final Hearing.

28.     The urgent need to preserve the Debtor's business, and avoid immediate and irreparable harm to the estate, makes it imperative that the Debtor be authorized to access post-petition financing on an interim basis and use cash collateral, pending the Final Hearing, in order to continue its operations and administer the Chapter 11 Case. Without the ability to borrow funds under the Interim DIP Facility and use cash collateral, the Debtor would be unable to meet its post-petition obligations or to fund its working capital needs, thus causing irreparable harm to the value of the Debtor's estate and ending the Debtor's reorganization efforts. Accordingly, the Debtor respectfully requests that, pending the hearing on a Final Order, the Interim Order be approved in all respects and that the terms and provisions of the Interim

Order be implemented and be deemed binding and that, after the Final Hearing, the Final Order be approved in all respects and the terms and provisions of the Final Order be implemented and be deemed binding.

## **RESERVATION OF RIGHTS**

29.    Notwithstanding the foregoing, the Debtor and the DIP Secured Lender are continuing to negotiate the terms of the Final DIP Facility.  Such terms may deviate from the terms proposed in the Interim DIP Facility, and the Debtor reserves all rights related thereto, notwithstanding rights, obligations, or terms included in the DIP Term Sheet.  For the avoidance of doubt, the Debtor reserves the right to negotiate any financing and lending term included in the Interim DIP Facility as part of the Final DIP Facility (and seek an order approving such terms) without such negotiation and request for a corresponding order constituting an Event of Default under the terms of the Interim Order and/or the Interim DIP Facility.

WHEREFORE, the Debtor respectfully requests entry of the Interim Order, substantially in the form attached hereto as **Exhibit A**, granting the relief requested herein and granting such other relief as is just and proper.

Dated:  Honolulu, Hawaii, November 30, 2020

/s/ Chuck C. Choi

Chuck C. Choi
Proposed Attorney for Debtor and Debtor-in-Possession Wing Spirit Inc.

20

# Exhibit A

## Proposed Interim Order

**EXHIBIT A**

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF HAWAII**

| | |
|---|---|
| In re | Chapter 11 |
| WING SPIRIT, INC., | Case No.  20-01383 |
| Debtor. | Re Docket No. _____ |

**ORDER (1) AUTHORIZING THE DEBTOR TO OBTAIN POST-PETITION
FINANCING ON AN INTERIM BASIS, GRANTING SENIOR
POSTPETITION SECURITY INTERESTS AND ACCORDING
SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS PURSUANT
TO SECTIONS 364(c) AND 364(d) OF THE BANKRUPTCY CODE, (2)
AUTHORIZING THE USE OF CASH COLLATERAL, (3) <u>MODIFYING
THE AUTOMATIC STAY, AND (4) GRANTING RELATED RELIEF</u>**

Upon the motion (the "<u>Motion</u>") of the above-captioned debtor (the "<u>Debtor</u>")

seeking, among other things:

(1) authority pursuant to sections 363 and 364(c) and (d) to obtain debtor-in-possession secured financing (the "<u>DIP Facility</u>") pursuant to the following terms and agreements (collectively, the "<u>DIP Financing Documents</u>"):  (a) this Order, and any final order entered by the Court with respect to the Motion (the "<u>Final Order</u>"), and (b) the *Wing Spirit, Inc., Terms and Conditions of Proposed Senior Secured, Super-Priority Debtor-in-Possession Credit Facility*, attached hereto as <u>Exhibit B</u>,

as amended, modified, and/or supplemented (the "DIP Term Sheet"),[1] by and among the Debtor, as borrower and debtor-in-possession, HT Holdings Co. Limited (the "DIP Secured Lender");

(2) the grant to the DIP Secured Lender of superpriority administrative claim status pursuant to sections 364(c)(1) and 507(b) of the Bankruptcy Code in accordance with the terms of this Order;

(3) authorization for the Debtor's use of cash collateral (the "DIP Cash Collateral"), as contemplated by section 363 of the Bankruptcy Code in accordance with the terms set forth herein;

(4) modification of the automatic stay to the extent hereinafter set forth and waiving the fourteen (14) day stay provisions of Federal Rule of Bankruptcy Procedure 4001(a)(3) and 6004(h); and

(5) a final hearing setting for the Motion for entry of an order authorizing the DIP Facility and use of DIP Cash Collateral on a final basis.

Notice of the Motion, the relief requested therein, and the Interim Hearing (as defined below) (the "Notice") having been served by the Debtor in accordance with Bankruptcy Rule 4001(c) on: (i) the DIP Secured Lender; (ii) the United States Trustee for the District of Hawaii (the "U.S. Trustee"); (iii) the holders of the twenty (20) largest unsecured claims against the Debtor's estate; (iv) all parties known to the Debtor who hold any liens or security interest in the Debtor's assets who have filed UCC-1 financing statements against the Debtor, or who, to the Debtor's knowledge, have asserted any liens on any of the Debtor's assets; (v) the Internal Revenue Service and all taxing authorities of states in which the Debtor conducts business; (vi) certain other parties identified in the certificates of service filed with the Court.

The Court held an interim hearing with respect to the Motion on

_____, 2020 (the "Interim Hearing").

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the DIP Term Sheet.

801180525.1
11/30/20 18:49AM

After the Motion and the proceedings before the Court at the Interim Hearing; and all objections, if any, to the interim relief requested in the Motion having been withdrawn, resolved or overruled by the Court as reflected on the record established by the Debtors at the Interim Hearing;

**THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**[2]

A.     On November 29, 2020 (the "Petition Date"), the Debtor filed a voluntary petition for relief pursuant to Chapter 11 of title 11, United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code");[3]

B.     The Debtor has continued in the management and operation of its business pursuant to sections 1107 and 1108, and no trustee or examiner has been appointed;

C.     The Debtor gave notice of the Motion as required under the Federal Rules of Bankruptcy Procedure and any applicable local rules of this Court;

D.     The Court has core jurisdiction over the Debtor's bankruptcy case, the Motion, and the parties and property affected by this Order pursuant to 28 U.S.C. §§ 157(b) and 1334, and venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409;

---

[2] To the extent, any findings of fact constitute conclusions of law, they are adopted as such, and vice versa, pursuant to Fed. R. Bankr. P. 7052.
[3] Unless otherwise noted, all statutory references are to the Bankruptcy Code.

801180525.1
11/30/20 18:49AM
U.S. Bankruptcy Court - Hawaii   #20-01383   Dkt # 5   Filed   11/30/20   Page 24 of 65

E.      As of the date hereof, the United States Trustee has not yet appointed an official committee of unsecured creditors in this case pursuant to section 1102 (a "Statutory Committee");

F.      The Debtor has admitted, represented and stipulated, the following (collectively, the "Stipulations"):

(1)      the DIP Secured Lender is only willing to provide postpetition financing to the Debtor through the DIP Facility and the DIP Financing Documents;

(2)      the Debtor reasonably and in good faith believes that the use of the DIP Cash Collateral and the loans, advances, and other financial accommodations to be obtained pursuant to the DIP Facility are sufficient to fund all projected legitimate and allowable expenses of its Chapter 11 case from the Petition Date during the period to which the Budget (as approved by the DIP Secured Lender) pertains; and

(3)      the Debtor is a duly organized, validly existing legal entity and has the requisite power and authority to own, lease, and operate its property, including, without limitation, the DIP Collateral.  The Debtor has the requisite power and authority to enter into, execute, deliver, and perform its obligations under the DIP Financing Documents and this Order and to incur the obligations provided for thereon.  Except as may be explicitly required in the

- 4 -

801180525.1
11/30/20 18:49AM
U.S. Bankruptcy Court - Hawaii   #20-01383   Dkt # 5   Filed  11/30/20   Page 25 of 65

DIP Financing Documents, no consent or waiver of, filing with, authorization, approval or other action by any shareholder, any federal, state, or other governmental authority or regulatory body or any other Person (other than the DIP Secured Lender), which has not already been obtained or done, is required in connection with the execution, delivery and performance by the Debtor of any of the documents required as a condition to the validity or enforceability of the DIP Financing Documents, other than entry by this Court of this Order;

G.     The Debtor is unable to obtain sufficient levels of unsecured credit allowable under section 503(b)(1) as an administrative expense necessary to maintain and conduct its business;

H.     All cash of the Debtors constitutes DIP Cash Collateral;

I.     The Debtor is unable to obtain secured credit except under the terms and conditions provided in this Order;

J.     It is in the best interest of the Debtor's estate that the Debtor be allowed to enter into the DIP Facility in order to obtain postpetition secured financing from the DIP Secured Lender, and use the DIP Cash Collateral subject to and in accordance with the terms of this Order and the DIP Financing Documents, on an interim basis under the terms and conditions set forth herein and in the DIP Financing Documents, as such is necessary to avoid immediate and irreparable harm to the Debtor's estate pending the Final Hearing;

- 5 -

K.     The Debtor believes that the extension of credit and financial accommodations under the DIP Facility and DIP Financing Documents is fair, reasonable, in good faith, negotiated at arm's length, reflects the Debtor's exercise of prudent business judgment, and is supported by reasonably equivalent value and fair consideration;

L.     The DIP Secured Lender is entitled to the protections of section 364(e) of the Bankruptcy Code;

M.     The Debtor requires access to the funding available under the DIP Facility and the DIP Financing Documents in order to satisfy administrative expenses associated with the operation of its business as a going concern and other costs relating to the administration of this chapter 11 case, and in order to avoid immediate and irreparable harm to the Debtor's estate pending the Final Hearing;

N.     The DIP Secured Lender is unwilling to provide postpetition financing to the Debtor, except under the terms of the DIP Financing Documents and this Order assuring that the liens and the various claims, superpriority claims, and other protections granted in this Order will not be affected by any subsequent reversal or modification of this Order or any other order, as provided in section 364(e), which is applicable to the postpetition financing arrangement contemplated in the DIP Financing Documents and the use of DIP Cash Collateral contemplated in this Order; and

O.     Good and sufficient cause exists for the issuance of this Order, to prevent immediate and irreparable harm to the Debtor's estate.

Based upon the foregoing, and after due consideration and good cause appearing therefor;

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED that:**

1.     The Motion is granted on an interim basis effective as of the Petition Date.  The Debtor is authorized, pursuant to sections 363 and 364, to enter into the DIP Facility and DIP Financing Documents, to execute such other and additional documents necessary or desired to implement the DIP Facility or DIP Financing Documents, to obtain postpetition secured financing from the DIP Secured Lender, and to use the DIP Cash Collateral, and the proceeds and products thereof, pursuant to the terms and conditions of the DIP Financing Documents and this Order to avoid immediate and irreparable harm to the Debtor's estate pending the Final Hearing. The Debtor shall use the advances obtained under the DIP Facility and the DIP Collateral (and DIP Cash Collateral) only for the purposes and in the amounts set forth in the DIP Term Sheet attached hereto as Exhibit B and Budget attached hereto as Exhibit A, subject to the terms and conditions set forth in the DIP Financing Documents.

2.     The Debtor shall pay to the DIP Secured Lender all DIP Facility advances, together with interest thereon accruing pursuant to the DIP Financing Documents, in full, in cash, at the times set forth in the Budget and DIP Financing

- 7 -

801180525.1
11/30/20 18:49AM

U.S. Bankruptcy Court - Hawaii   #20-01383   Dkt # 5   Filed  11/30/20   Page 28 of 65

Documents, but no later than the Termination Date (as defined in the DIP Term Sheet). All unpaid principal, interest, fees, costs and expenses in respect of the DIP Facility shall be due and payable in full by the Debtor on the Termination Date (as defined in the DIP Term Sheet), whether at maturity, upon acceleration or otherwise and if such amounts are not paid in full in cash, interest, fees, costs, and expenses in respect of the DIP Facility shall continue to accrue until paid in full.

3.     With respect to the Budget:

(a)  the Debtors' actual Budget line items shall each be adhered to, by line item, on a weekly basis and a cumulative basis for the Budget (as defined below) period then ending, subject to the Budget Variance described below, _provided_, _however_, that amounts not disbursed in a line item shall be deemed to roll over to subsequent weeks;

(b) actual amounts for each Budget line item may not vary unfavorably from the applicable Budget by more than ten percent (10.0%) per line item on a weekly basis (the "Budget Variance");

(c) for all fees within the Budget attributable to professionals of the Debtor or Statutory Committee, the Debtor shall reflect the fees for each separately retained professional of the Debtor or Statutory Committee on its own line item;

- 8 -

(d) Any fees payable to professionals retained by the DIP Secured Lender set forth in the Budget shall not be limited by the amounts set forth in the Budget.

4.      No proceeds of the DIP Facility or DIP Cash Collateral shall be used to (a) permit the Debtor or any other party-in-interest to challenge, contest, or institute any proceeding to determine (i) the validity, perfection, or priority of any security interests in favor of any of the DIP Secured Lender or (ii) the enforceability of the Debtor's obligations or the obligations of any guarantor under the DIP Financing Documents; (b) investigate, commence, prosecute or defend (or support any other person or entity in investigating, commencing, prosecuting, or defending) any claim, motion, proceeding or cause of action against the DIP Secured Lender or any of its agents, attorneys, advisors or representatives, including, without limitation, claims or causes of action relating to lender liability or subordination claims; (c) investigate, commence, prosecute, or defend (or support any other person or entity in investigating, commencing, prosecuting, or defending) any claim or proceeding or cause of action to disallow or challenge the obligations of the Debtor or any guarantor under the DIP Financing Documents, or (d) fund any acquisitions, capital expenditures, capital leases, or similar expenditures other than those specifically set forth in the Budget.

801180525.1
11/30/20 18:49AM

5. Pursuant to sections 363 and 364(c) and (d), the DIP Facility funds advanced pursuant to the terms of this Interim Order (collectively, the "Interim DIP Advances") shall be allowed administrative expenses of the Debtor's estate, which shall have priority in payment over any other indebtedness and/or obligations now in existence or incurred hereafter by the Debtor and over all administrative expenses or charges against property arising in the Debtor's Chapter 11 case and any superseding Chapter 7 case including, without limitation, those specified in Bankruptcy Code sections 105, 326, 328, 330, 331, 503(b), 506(c) (subject to the entry of the Final Order), 507(a), 507(b), 726, 1113 or 1114, subject and junior only to the payment of UST Fees (as hereinafter defined) (such claim, the "DIP Superpriority Claim"). The time of payment of the Interim DIP Advances shall not be altered, extended or impaired without the consent of the DIP Secured Lender by any plan or plans of reorganization that may hereafter be accepted or confirmed or any further orders of the Court which hereafter may be entered.

6. The reasonable fees and expenses of the DIP Secured Lender, regardless of whether such amounts were incurred prior to or after the Petition Date, shall be payable (without further notice, motion, or application to, order of, or hearing before, the Court) within ten (10) days after delivery to the Debtor and U.S. Trustee of a summary statement of the DIP Secured Lender professional fees and expenses subject to reimbursement by the Debtor; provided, however, that the

- 10 -

801180525.1
11/30/20 18:49AM

Debtor and the U.S. Trustee shall have ten (10) days following the receipt of such professional fee statement to object to the reasonableness of the fees and expenses included therein. If any objection is asserted, the Court shall decide the issue and the Debtor shall not be required to pay any disputed portion of such fees or expenses until the matter is resolved. For the avoidance of doubt, failure to pay such disputed fees or expenses while the Court resolves such dispute will not be an Event of Default, even if it is determined by the Court that such payment should have been made. The DIP Secured Lender shall have the right to charge the DIP Facility for any such fees and costs payable by the Debtor; and once charged, such costs shall be added to the total balance of DIP Facility obligations.

7. Pursuant to sections 363, 364(c), and 364(d), as security for the Interim DIP Advances and other postpetition costs payable under the DIP Financing Documents, the Debtor is hereby authorized to and is hereby deemed to grant to the DIP Secured Lender a valid, binding and enforceable lien, mortgage and/or security interest (a "Lien," and as so granted to the DIP Secured Lender, the "DIP Lien") in all of the Debtor's presently owned or hereafter acquired property and assets, whether such property and assets were acquired before or after the Petition Date, of any kind or nature, whether real or personal, tangible or intangible, wherever located, and the proceeds and products thereof (collectively, the "DIP Collateral"), excluding any causes of action that could be brought pursuant to sections 544, 545, 547, 548

- 11 -

of the Bankruptcy Code, or any applicable state fraudulent transfer statutes (the "Avoidance Actions"); provided, that subject to entry of the Final Order the DIP Collateral shall include proceeds of (and property received in respect of) Avoidance Actions ("Avoidance Proceeds").

8. Pursuant to sections 364(c) and (d), the DIP Lien shall be a first priority senior and priming lien on the DIP Collateral, subject and junior only to (a) the payment of UST Fees (as hereafter defined) and (b) valid, enforceable, properly perfected, and unavoidable prepetition Liens that existed on the Petition Date ("Senior Third Party Liens"). The DIP Lien shall not be subject or subordinate to any Lien which is avoided and which would otherwise be preserved for the benefit of the Debtor's estates under section 551, and in no event shall any person or entity who pays (or causes to be paid) any of the obligations under the DIP Financing Documents be subrogated, in whole or in part, to any rights, remedies, claims, privileges, liens or security interests granted to or in favor of, or conferred upon, the DIP Secured Lender by the terms of the DIP Financing Documents until such time as the obligations under the DIP Financing Documents and this Order are indefeasibly paid in full, in cash. The DIP Lien shall not be subject or subordinate to Liens arising after the Petition Date, other than Liens granted pursuant to this Order to the extent set forth in this Order.

801180525.1
11/30/20 18:49AM

9. Provided that each of the conditions set forth in this Paragraph are satisfied, the Debtor shall be authorized to use the DIP Cash Collateral only in accordance with the terms of the Budget, this Order, and the other DIP Financing Documents. The satisfaction of each of the following conditions shall constitute a condition to the Debtors' authorization to use any DIP Cash Collateral: (i) no Event of Default under (and as defined in the DIP Term Sheet) shall exist or be continuing; and (ii) the Termination Date (as defined in the DIP Term Sheet) shall not have occurred. If, on any date, any of such conditions is not satisfied, then the Debtor shall not be authorized to use any DIP Cash Collateral unless and until: (i) such use is consented to by DIP Secured Lender in its sole and absolute discretion; or (ii) such use of DIP Cash Collateral is authorized by the Court. Absent further order of the Court, if the Termination Date occurs, then the Debtor shall remit to the DIP Secured Lender, any DIP Cash Collateral then in the Debtor's possession for application to the DIP Facility obligations in a manner selected by the DIP Secured Lender in its sole discretion.

10. The automatic stay provisions of section 362 are hereby modified to permit (a) the Debtor and the DIP Secured Lender to implement and perform the DIP Facility and the DIP Financing Documents, including without limitation the provisions thereof with respect to the collection of Proceeds and (b) the creation and perfection of all Liens granted or permitted by this Order. The Debtor and the

801180525.1
11/30/20 18:49AM

holders of any DIP Lien shall not be required to enter into any additional security agreements to create, memorialize, and/or perfect any such liens, or to file UCC financing statements, mortgages, or other instruments with any other filing authority or take any other action to perfect any such Liens, which shall be and are deemed valid, binding, enforceable and automatically perfected by the docket entry of this Order by the Clerk of the Court. If, however, the holder of any DIP Lien in its sole and absolute discretion shall elect for any reason to enter into, file, record or serve any such financing statements or other documents with respect to any such Lien, then the Debtor shall execute same upon request and the filing, recording or service thereof (as the case may be) shall be deemed to have been made at the time and on the date of the docket entry of this Order by the Clerk of the Court.

11.     The DIP Liens and DIP Superpriority Claims shall be subject to right of payment of unpaid postpetition fees and expenses of the Clerk of the Court and the U.S. Trustee pursuant to 28 U.S.C. § 1930(a) in such amount, with respect to the U.S. Trustee, as agreed to by the U.S. Trustee or as determined by the Court (such fees, "UST Fees"); provided, however, that UST Fees shall first be paid with any unencumbered funds available (if any). Any amounts paid from the DIP Collateral or the proceeds thereof, or funded by the DIP Secured Lender with respect to the UST Fees to the entry of the Final Order shall be Interim DIP Advances.

- 14 -

12.     Neither the payment of any professional fees incurred by professionals of the Debtor or Statutory Committee, nor the use of any proceeds from the DIP Facility, shall include payment for any fees and expenses, if any, of any such professionals incurred directly or indirectly, in respect of, arising from or relating to:

A.     the initiation, joinder, support, or prosecution of any action contesting the indebtedness owed to DIP Secured Lender, or the validity of any liens granted to any of such party;

B.     preventing, hindering or otherwise delaying (or supporting any other person or entity in preventing, hindering or otherwise delaying), whether directly or indirectly, the exercise by DIP Secured Lender of any of its rights and remedies under the Interim Order, Final Order, or DIP Financing Documents, including, without limitation, any attempt to prevent, hinder or delay (or supporting any other person or entity in preventing, hindering or delaying) the submission of any credit bid by the DIP Secured Lender;

C.     the commencement, support, or prosecution of any action or proceeding of any claims, causes of action or defenses against the DIP Secured Lender, or any of its officers, directors, employees, agents, attorneys, affiliates, successors or assigns, including, without limitation, any attempt to recover or avoid any claim or interest from the DIP Secured Lender;

- 15 -

D.    any request to borrow money other than pursuant to the terms of the Interim Order, the Final Order, or the DIP Financing Documents;

E.    with respect to the Debtor, any of the Debtor's Chapter 11 Professionals, or any of their successors or assigns (including, without limitation, any trustee, responsible officer, examiner, estate administrator or representative, or similar person appointed in a case for the Debtor under any chapter of the Bankruptcy Code) performing or commencing any investigation or litigation (whether threatened or pending) by the Debtor or its estate with respect to any matter to be specified as not subject to challenge by the Debtor pursuant to this Order or the Final Order; or

F.    For any other purpose for which proceeds of the DIP Facility may not be used pursuant to the DIP Term Sheet.

13.    Subject to the entry of the Final Order, effective as of the time of commencement of the Debtor's bankruptcy cases on the Petition Date:

A.    The Debtor waives irrevocably all claims and rights, if any, it or its estate might otherwise assert against the DIP Collateral pursuant to Bankruptcy Code sections 506(c), 105(a) or any other applicable law;

B.    no entity in the course of the Debtor's bankruptcy case shall be permitted to recover from the DIP Collateral (whether directly or through the grant of derivative or equitable standing in the name of the Debtor or its estate)

- 16 -

any cost or expense of preservation or disposition of the DIP Collateral, including, without limitation, expenses and charges as provided in Bankruptcy Code sections 506(c), 105(a), or any other applicable law;

      C.     no entity shall be permitted to recover from the DIP Collateral, or assert against the DIP Secured Lender, any claim with respect to any unpaid administrative expense of the Debtor's bankruptcy cases, whether or not the Debtor's payment of such administrative claim was contemplated by or included in the Budget; and

      D.     the DIP Secured Lender shall not be subject to the "equities of the case" exception of Bankruptcy Code section 552(b), or to the equitable doctrines of "marshaling" or any similar claim or doctrine, with respect to any DIP Collateral.

14.    So long as the DIP Facility obligations remain outstanding, unless consented to in writing by the DIP Secured Lender, the Debtor shall not seek entry of any further orders in its Chapter 11 Case which authorizes (a) the obtaining of credit or the incurring of indebtedness pursuant to sections 364(c) or 364(d) of the Bankruptcy Code that does not repay the DIP Facility in full, in cash, (b) the return of goods pursuant to section 546(h) of the Bankruptcy Code to any creditor of the Debtor or to consent to any creditor taking any setoff against any of such creditor's prepetition indebtedness based upon any such return pursuant to section 553 of the

801180525.1
11/30/20 18:49 AM

Bankruptcy Code or otherwise, or (c) except with respect to Senior Third Party Liens, any other grant of rights against the Debtor and/or its estate that is secured by a Lien in the DIP Collateral or is entitled to superpriority administrative status that does not repay the DIP Facility in full, in cash.

15.     Upon the occurrence of: (i) an Event of Default (as such term is defined in the DIP Term Sheet); or (ii) the Debtors' failure to comply with the terms of this Order or the Final Order (including, without limitation, its failure to comply with the Budget, subject to any approved variances), and the giving of written notice thereof by the DIP Secured Lender to counsel to the Debtor, the Statutory Committee (if any), and the U.S. Trustee (which notice may be given by any manner of electronic transmission, the automatic stay being deemed lifted for such purpose) (the "Default Notice"), then, (i) the DIP Secured Lender shall be fully authorized, in its sole discretion to cease making DIP Facility advances to the Debtor, (ii) the DIP Secured Lender shall be fully authorized, in its sole discretion to  terminate the Debtor's use of the DIP Collateral (including without limitation DIP Cash Collateral) pursuant to this Order and the Budget, and/or (iii) the DIP Secured Lender shall be fully authorized, in its sole discretion to immediately terminate the DIP Facility and demand repayment of the DIP Facility obligations then outstanding.

16.     Further, upon the occurrence of an Event of Default and transmission of a Default Notice or upon the Termination Date:

801180525.1
11/30/20 18:49AM

A.     the DIP Secured Lender shall have the right, free of the restrictions of sections 362 or under any other section of the Bankruptcy Code or applicable law or rule (including, without limitation, Bankruptcy Rule 4001(a)), to take immediate reasonable action to protect the DIP Collateral from harm, theft and/or dissipation;

B.     with respect to an Event of Default as to which a Default Notice has been given, the Debtors, the Statutory Committee (if any), and the U.S. Trustee shall have five (5) business days from the date of the Default Notice (the "Remedy Notice Period") to obtain an order of the Court on notice to the DIP Secured Lender (a) enjoining or restraining the DIP Secured Lender from taking action or exercising rights and remedies (other than any rights and remedies set forth in Paragraph 15 herein, which may be exercised immediately upon the satisfaction of the conditions set forth in such paragraph) based upon the Event of Default specified in the Default Notice; or (b) challenging whether an Event of Default in the Default Notice has occurred or is continuing without cure (a "Restraint on Remedies").  During the Remedy Notice Period, the DIP Secured Lender shall refrain from exercising its rights and remedies (other than those which may be exercised upon the satisfaction of the conditions set forth in Paragraph 15 and below). Immediately upon expiration of the Remedy Notice Period unless a Restraint

- 19 -

on Remedies has timely been obtained from the Court, or with respect to and upon the Maturity Date, immediately:

(1)     the DIP Secured Lender shall have the right, free of the restrictions of section 362 or under any other section of the Bankruptcy Code or Bankruptcy Rules (including, without limitation, Bankruptcy Rule 4001(a)), to exercise contractual, legal and equitable rights and remedies as to all or such part of the DIP Collateral as it shall elect, and to apply the Proceeds (as such term is defined below) of the DIP Collateral to the repayment of the DIP Facility obligations; and

(2)     the DIP Secured Lender, should it so elect in its sole and absolute discretion as exercised by the filing of an appropriate statement with the Court, shall be deemed to have been granted "peaceful possession" of, and right of access to, all or any portion of the DIP Collateral, by the Debtors.

17.     The Debtor shall provide the DIP Secured Lender with (i) all financial statements, certificates, and reports required pursuant to the DIP Term Sheet in accordance with the timeframes specified therein and (ii) such additional information as the DIP Secured Lender shall reasonably request from the Debtor. The DIP Secured Lender and its representatives shall have reasonable access to the Debtor's business premises and to the DIP Collateral in order to review and evaluate

the physical condition of any of the DIP Collateral and/or to inspect the financial records and other records of the Debtors concerning the operation of the Debtors' business.

18.    For purposes of this Order, (a) "Proceeds" shall mean both (i) proceeds (as defined in the Uniform Commercial Code for the State of New York) and (ii) any and all payments, proceeds or other consideration realized upon the sale, liquidation, realization, collection or other manner of disposition of the DIP Collateral, whether in the ordinary course of the Debtors' business (including without limitation accounts, receivables, and other proceeds arising from the Debtors' sales of goods and/or performance of services) or other than in the ordinary course of the Debtors' business, and (b) "Disposition" shall mean any sale, liquidation, realization, collection or other manner of disposition of DIP Collateral other than in the ordinary course of the Debtors' business, including without limitation any sale authorized pursuant to section 363.

19.    Without the written consent of the DIP Secured Lender, the Debtor shall not change or alter the deposit, clearing, dominion, lockbox, and similar accounts maintained by or on behalf of the Debtor for the collection of Proceeds obtained in the ordinary course of the Debtor's business (the "Collection Accounts"), or the cash management systems, treasury management systems, and payment procedures under which such accounts and systems are administered (the

- 21 -

"Collection Procedures"). The DIP Secured Lender shall be deemed to have control of all of the Debtor's bank accounts, and any financial institutions in which such accounts of the Debtor are located are hereby authorized to act in accordance with any request of the DIP Secured Lender concerning such accounts, including, without limitation, requests to turnover funds therein without offset or deduction of any kind.

20. The Debtor and any successors to the Debtor, including without limitation any successor trustee or trustees, shall assign or direct to the DIP Secured Lender any and all Proceeds realized in any Disposition of any DIP Collateral outside the ordinary course of business, and immediately deliver any and all such Proceeds which come into their possession to the DIP Secured Lender in the form received; provided, however, that the foregoing shall be subject in all respects to (a) payment of the UST Fees and (b) the priorities of the DIP Lien granted by this Order. The foregoing is without prejudice to the rights of (a) the DIP Secured Lender, the Statutory Committee (if any), or any other party to object to any proposed Disposition, or (b) any third party with respect to the allocated Proceeds of any Disposition of Collateral encumbered by a Senior Third Party Lien. The DIP Secured Lender is hereby authorized to credit-bid all or any of the obligations under the DIP Facility a at any Disposition of any DIP Collateral.

21. All Proceeds retained by the DIP Secured Lender shall be applied to the repayment of the DIP Facility obligations, in a manner selected by the DIP Secured

- 22 -

Lender, until such obligations are paid in full; <u>provided, however</u>, that the foregoing shall be subject in all respects to the terms and the priorities of liens under this Order. Such applications of Proceeds shall be free and clear of any claim, charge, assessment or other liability.

22.     In making decisions to advance any extensions of credit to the Debtor pursuant to the DIP Facility or in taking any other actions reasonably related to this Order or the DIP Financing Documents (including, without limitation, the exercise of its approval rights with respect to any budget), the DIP Secured Lender shall have no liability to any third party and shall not be deemed to be in control of the operations of the Debtor or to be acting as a "control person", "responsible person" or other "owner or operator" with respect to the operation or management of the Debtor (as such terms, or any similar terms, are used in the Internal Revenue Code, the United States Comprehensive Environmental Response Compensation and Liability Act, as amended, or any similar Federal or state statute), and the DIP Secured Lender's relationship with the Debtor shall not constitute or be deemed to constitute a joint venture or partnership of any kind between the DIP Secured Lender and the Debtor.

23.     This Order shall be binding upon and inure to the benefit of the DIP Secured Lender, the Debtor, and their respective successors and assigns, including, without limitation, any trustee, responsible officer, examiner, estate administrator or

801180525.1
11/30/20 18:49AM
U.S. Bankruptcy Court - Hawaii   #20-01383   Dkt # 5   Filed   11/30/20   Page 44 of 65

representative, or similar person appointed in a case for the Debtor under any chapter of the Bankruptcy Code. Except as set forth herein with respect to the UST Fees, no rights are created under this Order for the benefit of any creditor of the Debtor, any other party in interest in the Debtor's bankruptcy cases, or any other persons or entities, or any direct, indirect or incidental beneficiaries thereof.

24. Any order dismissing the Debtor's Chapter 11 Case under section 1112 or otherwise shall be deemed to provide (in accordance with sections 105 and 349 of the Bankruptcy Code) that (a) the DIP Secured Lender's liens and security interests in the DIP Collateral shall continue in full force and effect notwithstanding such dismissal until the DIP Facility obligations are indefeasibly paid and satisfied in full, in cash; and (b) this Court shall retain jurisdiction, to the extent permissible under applicable law, notwithstanding such dismissal, for the purposes of enforcing the DIP Superpriority Claim and the DIP Liens.

25. To the extent that any of the provisions of this Order shall conflict with any provisions of the DIP Term Sheet, or with any order of the Court authorizing the Debtor to continue the use of prepetition bank accounts, cash management systems, treasury management systems, or business forms, or any similar orders, this Order is deemed to control and supersede the conflicting provisions therein.

26. The terms and conditions of this Order shall be effective and immediately enforceable upon its entry by the Clerk of the Court notwithstanding

- 24 -

any potential application of Fed. R. Bankr. P. 6004(h) or otherwise. Furthermore, to the extent applicable, the notice requirements and/or stays imposed by Fed R. Bankr. P. 4001(a)(3), 6003(b), and 6004(a) are hereby waived for good and sufficient cause.

27.    Nothing in this Order shall preclude the Court from entering a Final Order containing provisions inconsistent with or contrary to the provisions of this Order, provided, however, that the DIP Secured Lender shall be entitled to the benefits and protections of this Order, including the protections afforded pursuant to section 364(e), with respect to all loans, advances, and other financial, accommodations made by them pursuant to this Order. The DIP Lien and the priority afforded the Interim DIP Advances, as set forth in this Order, shall be binding on the Debtor and any successor trustee or trustees even if this Order is reversed or modified on appeal with respect to all loans, advances, and other financial accommodations made by them pursuant to this Order. Except as provided herein, no Proceeds or DIP Cash Collateral may be used by any party in interest seeking to modify any of the rights granted to DIP Secured Lender hereunder or in the DIP Financing Documents.

28.    The Debtor is authorized to do and perform all acts, to make, execute and deliver all instruments and documents, and to pay all fees and expenses that may be required or necessary for the Debtor's performance under this Order or the DIP

Financing Documents, including, without limitation, (a) the execution of the DIP Financing Documents, and (b) the payment of the fees and other expenses described herein or in the DIP Financing Documents as such become due. The Debtor is further authorized to continue to negotiate any supplemental or modified DIP Facility terms concerning potential advances after the First Interim DIP Advance (as defined in the DIP Term Sheet), as well as the terms of any subsequent interim or final orders related to any such potential DIP Facility advances, and both the Debtor and DIP Secured Lender reserve all rights regarding such negotiations.

29.     The Court has considered and determined the matters addressed herein pursuant to its powers under the Bankruptcy Code, including the power to authorize the Debtor to obtain credit on terms and conditions to which the Debtor and DIP Secured Lender have agreed. Thus, each of the terms and conditions constitutes a part of the authorization under sections 364 of the Bankruptcy Code, and is, therefore, subject to the protections contained in section 364(e) of the Bankruptcy Code, regardless of (i) any stay, modification, amendment, vacation, or reversal of this Order or the DIP Financing Documents or any term hereunder or thereunder; (ii) the failure to obtain a final order pursuant to Bankruptcy Rule 4001(c)(2), or (iii) the dismissal or conversion of this chapter 11 case.

30.     A final hearing with respect to the Motion is scheduled for [_____], 2020 at [_____].m. (the "<u>Final Hearing</u>") before the Honorable Robert J.

801180525.1
11/30/20 18:49AM

Faris, United States Bankruptcy Judge. The Debtors shall promptly mail copies of this Order (which shall constitute adequate notice of the Final Hearing) to the parties having been given notice of the Interim Hearing and to any other party that has filed a Rule 2002 request for service. Any party in interest objecting to the relief sought at the Final Hearing shall file written objections, and serve them on (i) the Debtor's proposed counsel; (ii) the DIP Secured Lender's counsel, Holland & Knight LLP, attn: Robert W. Jones, 200 Crescent Court, Suite 1600, Dallas, TX 75201 and [H&K Local Counsel]; and (iii) the Office of the U.S. Trustee.

## END OF ORDER

Submitted by:

CHUCK C. CHOI
ALLISON A. ITO
Email: cchoi@hibklaw.com
Email: aito@hibklaw.com
TOPA FINANCIAL CENTER
700 Bishop Street, Suite 1107
Honolulu, Hawaii 96813
Telephone: (808) 533-1877
Facsimile: (808) 566-6900

Proposed Attorney for the Debtor

**Exhibit A**

**Interim Approved Budget**

(See Attached)

| ID | Entity | Dept | Location | Account | Descriptions | Amount | Payment | Pay amount |
|----|--------|------|----------|---------|--------------|--------|---------|-----------|
| 1 | WS | HEAL | 1_Admin | 01_Salary and Wages | Salary（Include fringe benefits）（HEAL）/ 1 person | 6,725.19 | Pay | 6,725.19 |
| 2 | | | | 02_Rentals | Rent for Harbour court 1610 | 3,935.63 | Not pay | 0.00 |
| 3 | | | | 05_Professional & Technical | Fee for Medical directors | 17,500.00 | Pay | 17,500.00 |
| 4 | | | | | Ambulance billing Consulting | 12,000.00 | Pay | 12,000.00 |
| 5 | | | | 07_MX&Repair | Subscription for electric medical record（EMS chart) | 976.71 | Pay | 976.71 |
| 6 | | | | 08_Outside Services | Bank fee | 3.95 | Pay | 3.95 |
| 7 | | | | 09_Supplies | Medical supplies | 3,515.78 | Not pay | 0.00 |
| 8 | | | | | Medical equipments | 12,935.79 | Not pay | 0.00 |
| 9 | | | | | Blood Test Kits | 88.55 | Not pay | 0.00 |
| 10 | | | | | Cleaner for cleaning aircraft interiors | 115.20 | Not pay | 0.00 |
| 11 | | | | | Oxygen pump | 127.60 | Not pay | 0.00 |
| 12 | | | | | Ventilator tubes | 126.61 | Not pay | 0.00 |
| **13** | | | **Total** | | | **58,051.01** | | **37,205.85** |
| 14 | | | 2_Membership | 01_Salary and Wages | Salary（Include fringe benefits）（HEAL）/ 3 persons | 9,361.78 | Pay | 9,361.78 |
| 15 | | | | 08_Outside Services | Credit card fee | 156.94 | Pay | 156.94 |
| **16** | | | **合計** | | | **9,518.72** | | **9,518.72** |
| 17 | | | 3_Dispatch | 01_Salary and Wages | Salary（Include fringe benefits）（HEAL）/ 4 persons | 12,146.99 | Pay | 12,146.99 |
| **18** | | | **Total** | | | **12,146.99** | | **12,146.99** |
| 19 | | | 4_Honolulu | 01_Salary and Wages | Salary（Include fringe benefits）（HEAL）/ 6 persons | 24,882.46 | Pay | 24,882.46 |
| 20 | | | | 02_Rentals | Rent for mobile office | 3,749.42 | Not pay | 0.00 |
| 21 | | | | 04_Communications | Phone for mobile office | 891.21 | Pay | 891.21 |
| 22 | | | | 08_Outside Services | Medical disposal | 41.88 | Pay | 41.88 |
| **23** | | | **Total** | | | **29,564.97** | | **25,815.55** |
| 24 | | | 5_Kauai | 01_Salary and Wages | Salary（Include fringe benefits）（HEAL）/ 5 persons | 21,094.35 | Pay | 21,094.35 |
| 25 | | | | 02_Rentals | Rent for base house | 2,600.00 | Not pay | 0.00 |
| 26 | | | | 04_Communications | Internet for base house | 204.34 | Not pay | 0.00 |
| 27 | | | | 06_Utilities | Electricity for base house | 203.95 | Not pay | 0.00 |
| **28** | | | **合計** | | | **24,102.64** | | **21,094.35** |
| 29 | | | 6_Hilo | 01_Salary and Wages | Salary（Include fringe benefits）（HEAL）/ 7 persons | 30,729.34 | Pay | 30,729.34 |
| 30 | | | | 02_Rentals | Rent for base house | 2,200.00 | Pay | 2,200.00 |
| 31 | | | | | Rent for airpot office | 3,000.00 | Pay | 3,000.00 |
| 32 | | | | 03_Transportaions | Rent-a-car for base | 302.16 | Pay | 302.16 |
| 33 | | | | | Inter-island transportations / Clearwater | 245.94 | Not pay | 0.00 |
| 34 | | | | 04_Communications | Internet for base house | 222.74 | Pay | 222.74 |
| 35 | | | | 06_Utilities | Electricity for base house | 187.70 | Pay | 187.70 |
| **36** | | | **Total** | | | **36,887.88** | | **36,641.94** |
| 37 | | | 7_Maui | 01_Salary and Wages | Salary（Include fringe benefits）（HEAL）/ 5 persons | 23,684.95 | Pay | 23,684.95 |
| 38 | | | | 02_Rentals | Rent for base house | 2,700.00 | Pay | 2,700.00 |
| 39 | | | | 03_Transportaions | Rent-a-car for base | 272.87 | Pay | 272.87 |
| 40 | | | | | Inter-island transportaions / Thomas | 107.80 | Not pay | 0.00 |
| **41** | | | **Total** | | | **197,037.84** | | **142,423.41** |

U.S. Bankruptcy Court - Hawaii  #20-01383  Dkt # 5  Filed 11/30/20  Page 50 of 65

| ID | Entity | Dept | Location | Account | Descriptions | Amount | Payment | Pay amount |
|---|---|---|---|---|---|---|---|---|
| 42 | VIP | | | 01_Salary and Wages | Salary（Include fringe benefits）（VIP）／1 person | 3,661.25 | Pay | 3,661.25 |
| 43 | | | | 08_Outside Services | Fee for credit card terminal contract | 163.26 | Pay | 163.26 |
| 44 | | | Total | | | 3,824.51 | | 3,824.51 |
| 45 | | Total | | | | 3,824.51 | | 3,824.51 |
| 46 | HQ | Hanger | | 02_Rentals | Rent for State Hanger | 9,996.48 | Pay | 9,996.48 |
| 47 | | | | 04_Communications | Phone for State hanger | 1,627.78 | Pay | 1,627.78 |
| 48 | | | | 06_Utilities | Disposal services for State hanger | 125.66 | Pay | 125.66 |
| 49 | | | | | Electricity for State hanger | 1,878.55 | Pay | 1,878.55 |
| 50 | | | | 09_Supplies | Water server for State hanger | 343.58 | Not pay | 0.00 |
| 51 | | | Total | | | 13,972.05 | | 13,628.47 |
| 52 | | Aircraft | | 02_Rentals | Aircraft Lease Fee  N191WS/ SN155 | 73,681.65 | Not pay | 0.00 |
| 53 | | | | | Aircraft Lease Fee  N192WS/ SN156 | 73,681.65 | Not pay | 0.00 |
| 54 | | | | | Aircraft Lease Fee  N193WS/ SN160 | 73,681.65 | Not pay | 0.00 |
| 55 | | | | | Aircraft Lease Fee  N992WS/ SN073 | 48,633.75 | Not pay | 0.00 |
| 56 | | | | 07_MX&Repair | Flight ready program P2 - Calender | 2,973.80 | Not pay | 0.00 |
| 57 | | | | 10_Insurance | Insurance for Aircrafts | 20,866.31 | Pay | 20,866.31 |
| 55 | | | | 17_ACI | Fee for Aircraft Operations | 212,058.06 | Pay | 177,550.28 |
| 59 | | | Total | | | 505,576.87 | | 198,416.59 |
| 60 | | HQ | | 01_Salary and Wages | Salary（Include fringe benefits）（Fin & Acct）／3 persons | 11,865.06 | Pay | 11,865.06 |
| 61 | | | | | Salary（Include fringe benefits）（CEO office）／4 persons | 13,742.31 | Pay | 13,742.31 |
| 62 | | | | | Salary（Include fringe benefits）（Admin）／1 persons | 2,522.21 | Pay | 2,522.21 |
| 63 | | | | | Salary（Include fringe benefits）（HR／Legal）／1 person | 5,349.44 | Pay | 5,349.44 |
| 64 | | | | 02_Rentals | Parking fee | 435.00 | Not pay | 0.00 |
| 65 | | | | | Rent for Printer | 955.14 | Not pay | 0.00 |
| 66 | | | | | Rent for Harbour court 1600 | 24,844.83 | Not pay | 0.00 |
| 67 | | | | | Rent for Harbour court 1610 | 11,806.90 | Not pay | 0.00 |
| 68 | | | | 04_Communications | Internet for Harbour court | 334.94 | Pay | 334.94 |
| 69 | | | | | Phone for Harbour court | 1,116.52 | Pay | 1,116.52 |
| 70 | | | | 05_Professional & Technical | Fee for Visual Systems | 1,712.56 | Pay | 1,712.56 |
| 71 | | | | | Capitol Consultant of Hawaii | 13,612.56 | Not pay | 0.00 |
| 72 | | | | | Tokyo Planning Office | 250,000.00 | Not pay | 0.00 |
| 73 | | | | 08_Outside Services | Bank fee | 302.87 | Pay | 302.87 |
| 74 | | | | 09_Supplies | Parking validation ticket | 275.00 | Not pay | 0.00 |
| 75 | | | | | Tea in break room | 664.27 | Not pay | 0.00 |
| 76 | | | | 10_Insurance | General liability insurance | 3,478.27 | Pay | 3,478.27 |
| 77 | | | | | Auto insurance | 592.97 | Pay | 592.97 |
| 78 | | | Total | | | 343,610.85 | | 41,017.15 |
| 79 | | Total | | | | 863,159.77 | | 253,062.21 |
| 80 | Total | | | | | 1,064,022.12 | | 399,310.13 |

**Exhibit B**

**DIP Term Sheet**

(See Attached)

**Wing Spirit, Inc.**
**Terms and Conditions of**
**Proposed Senior Secured, Super-Priority**
**Debtor-in-Possession Credit Facility**

---

*The terms outlined below in these Terms and Conditions (this "**DIP Term Sheet**") are the terms and conditions for a senior secured, super-priority debtor-in-possession interim credit facility (hereinafter referred to as the "**DIP Facility**") to be made available to the Debtor. This DIP Term Sheet, the Interim Order and the Final Order shall collectively constitute the exclusive and definitive documentation and agreement among the parties for the DIP Facility (the "**DIP Financing Documents**"). Unless otherwise defined herein, capitalized terms shall have the meaning given to them as set out in the Section titled "Other Definitions" below.*

---

| | |
|---|---|
| **Borrower/Debtor:** | Wing Spirit, Inc. [1] |
| **Amount and Type of Facility:** | The first interim advance under the DIP Facility (the "**First Interim DIP Advance**") will consist of a single term advance in the principal amount of $399,310.13. As set forth in the "Fees and Expenses" section herein, the DIP Secured Lender shall have the right to charge the DIP Facility for any fees and expenses incurred by the DIP Secured Lender and payable to the DIP Secured Lender hereunder, and once charged, such costs shall be added to the total balance of DIP Facility obligations. At the DIP Secured Lender's sole discretion, additional DIP Facility advances, in amounts determined by the DIP Secured Lender in its sole discretion, may be furnished by the DIP Secured Lender to the Debtor after further notice and a Bankruptcy Court hearing approving such subsequent advances. Nothing herein shall obligate the DIP Secured Lender to make any advances, other than the First Interim DIP Advance. |
| **DIP Secured Lender:** | HT Holdings Co. Limited. |
| **Borrowing Availability:** | DIP Facility advance(s) shall be limited by Budget and the terms of this DIP Term Sheet. |
| **Budget and Variances:** | Subject to the Budget Variances (as defined below), each of the line items within the Budget shall be adhered to, by line item, on a weekly basis and a cumulative basis for the Budget period then ending as described below, ***provided however*** that amounts not disbursed in a line item shall be deemed to roll over to subsequent weeks. The Debtor's disbursements for fees and expenses of third party professionals engaged by or for the benefit of the Debtor or the Statutory Committee (if any), including success or transaction fees (collectively, "**Professional Fees**") shall be reported in a manner so that Professional Fees for each retained professional are reflected on its own line item. Any fees payable to professionals retained by the DIP Secured Lender set forth in the Budget shall not be |

---

[1]  Note: the term sheet has been prepared on the assumption that Wing Spirit Inc. is the sole debtor.

limited by the amounts set forth in the Budget.

Actual amounts for each Budget line item may not vary unfavorably from the applicable Budget by more than ten percent (10.0%) per line item on a weekly basis (the "**Budget Variances**").

On or before Wednesday of each week, commencing with the first full week following the Petition Date, the Debtor shall deliver to the DIP Secured Lender an Approved Budget Compliance Report.

**Fees:**                          The Debtor agrees to pay the costs and expenses of the DIP Secured Lender as set forth in the Section titled "*Fees and Expenses*" below.

**Termination Date:**              The earliest to occur of:

(a)     the Maturity Date;

(b)     December 14th, 2020, if the Final Order has not been entered on or before that date;

(c)     acceleration of the obligations under the DIP Facility as a result of an Event of Default;

(d)     the effective date of a confirmed plan of reorganization or liquidation that provides for indefeasible payment in full, in cash of all obligations owing under the DIP Facility and is otherwise acceptable to the DIP Secured Lender in its sole discretion;

(e)     the date which is the closing date of any sale of all or substantially all of any Debtor's assets;

(f)     the entry of an order by the Bankruptcy Court:
  (i)   granting relief from the automatic stay permitting foreclosure of any assets of the Debtor with a value in excess of $25,000 in the aggregate;
  (ii)  granting any motion by the DIP Secured Lender to terminate the use of cash collateral or lift the stay or otherwise exercise remedies against any cash collateral;
  (iii) appointing a trustee or an examiner with special powers; or
  (iv)  dismissing or converting the Chapter 11 Case;

(g)     the filing or support by the Debtor of a plan of reorganization that:
  (i)   does not provide for indefeasible payment in full, in cash of all obligations owing under the DIP

Facility on the effective date of such plan or

(ii) is not otherwise acceptable to the DIP Secured Lender in its sole discretion; and

(h)    entry of a Bankruptcy Court order granting liens or claims that are senior or *pari passu* to the liens securing the DIP Facility.

The date on which the earliest of clauses (a) through (h) above occurs and the DIP Secured Lender provides written notice thereof to the Debtor being referred to hereinafter as the "**Termination Date**". On the Termination Date, the DIP Facility shall be deemed terminated, and the DIP Secured Lender shall have no further obligation to provide financing pursuant to the DIP Facility or DIP Financing Documents.

**Non-Default Interest Rate and Payment Terms:**      Interest on all outstanding advances under the DIP Facility shall accrue from and after the Petition Date at a per annum rate equal to three percent (3.0%) per annum (the "**Non-Default Interest Rate**").

**Default Interest Rate:**      Effective immediately upon the occurrence of an Event of Default unless waived in writing by the DIP Secured Lender, interest on the outstanding loans under the DIP Facility shall accrue at a rate that is two percent (2.0%) per annum in excess of the Non-Default Interest Rate.

**Loan Payments:**      The Debtor promises and agrees to pay to the DIP Secured Lender all DIP Facility advances, together with interest thereon accruing pursuant to the DIP Financing Documents, in full, in cash, on the Maturity Date.

All unpaid principal, interest, fees, costs and expenses in respect of the DIP Facility shall be due and payable in full by the Debtor on the Termination Date, whether at maturity, upon acceleration or otherwise and if such amounts are not paid in full in cash, interest, fees, costs, and expenses in respect of the DIP Facility shall continue to accrue until paid in full.

**Use Of Proceeds:**      Proceeds of the DIP Facility shall be used solely for the following purposes and only to fund expenditures set forth in the Budget in the amounts set forth in each Budget line item:

(a)    to fund post-petition operating expenses and working capital needs of the Debtor, including, but not limited to, those activities required to remain in, or return to, compliance with laws in accordance with 28 U.S.C. § 1930;

(b)    to pay interest, fees and expenses to the DIP Secured Lender in accordance with this DIP Term Sheet (whether

or not such amounts are reflected in the Budget); and

(c) to pay certain other costs and expenses of administration of the Chapter 11 Cases.

Proceeds of the DIP Facility or cash collateral shall not be used (a) to permit any Debtor, or any other party-in-interest or their representatives to challenge or otherwise contest or institute any proceeding to determine (i) the validity, perfection or priority of security interests in favor of the DIP Secured Lender or (ii) the enforceability of the obligations of any Debtor or any guarantor under the DIP Facility, (b) to investigate, commence, prosecute or defend (or support any other person or entity in investigating, commencing, prosecuting, or defending) any claim, motion, proceeding or cause of action against the DIP Secured Lender or any of its agents, attorneys, advisors, owners, employees, or representatives including, without limitation, any lender liability claims or subordination claims, (c) to investigate, commence, prosecute or defend (or support any other person or entity in investigating, commencing, prosecuting, or defending) any claim or proceeding or cause of action to disallow or challenge the obligations of any Debtor or any guarantor under the DIP Financing Documents, or (d) to fund acquisitions, capital expenditures, capital leases, or any other similar expenditure other than capital expenditures specifically set forth in the Budget and approved by the DIP Secured Lender.

**Cash Management Collections and Remittances:** The Debtor shall use a cash management system that is the same as or substantially similar to their pre-petition cash management system. Any material changes from such pre-petition cash management system must be acceptable to the DIP Secured Lender in its sole discretion. The Interim Order and Final Order shall provide the DIP Secured Lender with a valid and enforceable lien and security interest on the cash held in the Debtor's bank accounts.

**Super-Priority Administrative Claim:** Amounts owed by Debtor to the DIP Secured Lender pursuant to the DIP Facility (including all accrued interest, fees, costs and expenses) shall constitute, in accordance with Section 364(c)(1) of the Bankruptcy Code, a claim having priority over any or all administrative expenses of the kind specified in, among other sections, Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 726, 1113, or 1114 of the Bankruptcy Code, subject to payment of the UST Fees (such claim, the "**DIP Superpriority Claim**").

**Collateral Security:** Subject and subordinate only to:

(a) any valid, properly perfected, enforceable, non-avoidable prior liens and security interests existing as of the Petition Date (the "**Senior Third Party Liens**"); and

(b)     the payment of UST Fees,

the DIP Facility (including accrued interest, fees, costs and expenses) shall be secured by first priority senior and priming liens and security interests (the "**DIP Liens**") in all of the Debtor's property, including, without limitation, all of Debtor's existing and future acquired property and interests of any nature whatsoever, real and personal, tangible and intangible, accounts receivable, general intangibles, payment intangibles, supporting obligations, investment property, commercial tort claims, inventory, rolling stock, aircraft, machinery, equipment, subsidiary capital stock, chattel paper, documents, instruments, deposit accounts, contract rights, and tax refunds of the Debtor, excluding only Avoidance Actions, but including, subject to entry of the Final Order, Avoidance Proceeds (collectively, the "**DIP Collateral**").

**Lien Validation and Perfection:**

All liens authorized and granted pursuant to the Interim Order or the Final Order entered by the Bankruptcy Court approving the DIP Facility or with respect to adequate protection shall be deemed effective and perfected as of the Petition Date, and no further filing, notice or act will be required to effect such perfection.

**506(c) Surcharge/Equities of Case**

Upon entry of the Final Order, the Debtor hereby waives any right to surcharge the DIP Collateral, whether pursuant to Bankruptcy Code sections 506(c) or 105(a) or under any other applicable law.

Upon entry of the Final Order, the DIP Secured Lender shall not be subject to the "*equities-of-the-case*" exception of Bankruptcy Code section 552(b), or to the equitable doctrines of "*marshaling*" or any similar claim or doctrine with respect to any DIP Collateral.

**Fees and Expenses:**

The Debtor shall promptly pay or reimburse the DIP Secured Lender when requested for all reasonable and documented costs and expenses of counsel (including, without limitation, local counsel) and financial advisors for the DIP Secured Lender relating to the DIP Facility and the administration and interpretation of, and the enforcement of remedies under, the DIP Facility, regardless of whether such amounts were incurred prior to or after the Petition Date, including but not limited to, due-diligence, duplication or printing costs, consultation, travel, and attendance at court hearings, regardless of whether the DIP Facility is consummated. The DIP Secured Lender shall have the right to charge the DIP Facility for any such fees and costs; and once charged, such costs shall be added to the total balance of DIP Facility obligations. Failure to pay such fees and expenses within ten (10) days of delivery of the applicable fee reimbursement request (unless the DIP Secured Lender shall have consented to

charging such amounts to the DIP Facility in lieu of cash payment) shall be an Event of Default under the DIP Facility, provided that the DIP Secured Lender shall concurrently provide copies of any fee reimbursement request to the U.S. Trustee and the Debtor and allow such parties ten (10) days to review and object to any fees or expenses requested therein. If any objection is asserted, the Bankruptcy Court shall decide the issue and the Debtor shall not be required to pay any disputed portion of such fees or expenses until the matter is resolved.

| | |
|---|---|
| **Conditions Precedent to DIP Facility Advance:** | The closing of the DIP Facility shall be subject to: |

(a)    approval of the Budget by the DIP Secured Lender, together with all financial information and projections regarding the Debtor requested by the DIP Secured Lender, all in form and substance satisfactory to the DIP Secured Lender in its sole discretion;

(b)    entry of a Bankruptcy Court order approving the DIP Facility, the DIP Liens, and the DIP Superpriority Claim, and containing such other orders and findings as the DIP Secured Lender may require, including modification of the automatic stay after a specified notice period following the occurrence of an Event of Default enabling the DIP Secured Lender to exercise certain rights and remedies against the DIP Collateral, which Bankruptcy Court Order, shall not have been modified or amended without approval of the DIP Secured Lender, and shall not have been reversed, vacated or stayed pending appeal, in form and substance satisfactory to the DIP Secured Lender in its sole discretion;

(c)    the DIP Secured Lender's approval of all material motions and orders filed in the Chapter 11 Case requiring the expenditure of cash;

(d)    continuation of Debtor's present cash management system; and

(e)    the form and substance of this DIP Term Sheet shall be satisfactory to the DIP Secured Lender in its sole discretion.

| | |
|---|---|
| **Additional Conditions to the Borrowing Under the DIP Facility:** | Each funding of a DIP Facility advance shall also be subject to the following conditions precedent: |

(a)    there shall exist no Event of Default (or event that would constitute an Event of Default with the giving of notice or lapse of time) under any of the DIP Financing Documents, and the representations and warranties therein shall be true and correct in all material respects;

(b)    there shall have occurred no material adverse change in the Debtor's operations (financial, environmental, or otherwise), performance, or properties, since the filing of the Chapter 11 Case, that has or could be expected to have a material adverse effect on the rights and remedies of the DIP Secured Lender or on the ability of any Debtor to perform its obligations under the DIP Facility;

(c)    compliance with Bankruptcy Rule 4001, the entry of the Interim Order and the Final Order (as applicable), together with any other order requested by the DIP Secured Lender authorizing and approving the DIP Facility in form, substance and amount acceptable to the DIP Secured Lender in its sole discretion;

(d)    payment of all fees and expenses owing to the DIP Secured Lender in connection with the DIP Facility (or the DIP Secured Lender shall be satisfied, acting in its sole discretion, that such fees and expenses shall be paid contemporaneously with the funding of a DIP Facility advance); and

(e)    the DIP Financing Documents and the Interim and Final Orders shall include such waivers, indemnities, and other provisions as are acceptable to the DIP Secured Lender in its sole discretion.

**Affirmative and Negative Covenants:**    The Debtors shall comply with the following affirmative and negative covenants:

(a)    compliance with Budget covenants consistent with the Section titled "*Budget and Variances*"; and

(b)    no Material Adverse Effect shall occur.

**Bankruptcy Court Filings:**    As soon as reasonably practicable in advance of filing with the Bankruptcy Court, the Debtor shall furnish to the DIP Secured Lender the drafts of forms of the following (which shall not have been modified or amended upon filing in any material respect without approval of the DIP Secured Lender):

(a)    the motion seeking approval of the DIP Facility, which motion shall be in form and substance satisfactory to the DIP Secured Lender in its sole discretion;

(b)    all other proposed orders and pleadings related to the DIP Facility (other than the Interim Order or Final Order), which orders and pleadings shall be in form and substance satisfactory to the DIP Secured Lender at its sole discretion;

(c) any plan of reorganization or liquidation, and/or any disclosure statement related to such plan (which plan or disclosure statement shall comply with the requirements set forth herein), which shall be in form and substance satisfactory to the DIP Secured Lender in its sole discretion,

(iv) any motion seeking approval of any sale of the Debtor's assets and any proposed form of a related bidding procedures order and sale order; and

(v) any other motion filed seeking approval of any matter requiring material expenditures of DIP Collateral (each of which must be in form and substance satisfactory to the DIP Secured Lender in its sole discretion).

**Remedies:**
Following the Termination Date or the occurrence of an Event of Default, unless such Event of Default has been waived by the DIP Secured Lender in writing in its sole discretion, the DIP Secured Lender shall be entitled to:

(a) declare all DIP Facility obligations to be immediately due and payable and/or terminate the Debtor's use of cash collateral; and

(b) exercise any remedies available to secured creditors under applicable law, including, without limitation, the right to realize on all DIP Collateral, without the necessity of obtaining any further relief or order from the Bankruptcy Court.

Consistent with the foregoing, section 362 relief from the stay in favor of the DIP Secured Lender, as provided herein, shall be embodied in any order approving the DIP Facility and the use of cash collateral.

**Events of Default:**
Defaults and Events of Default shall mean the occurrence of any of the following:

- The Chapter 11 Case shall be converted to a case under Chapter 7 of the Bankruptcy Code or be dismissed.

- Filing or support of a proposed plan of reorganization by any Debtor that does not provide for the indefeasible payment in full and in cash of Debtor's obligations outstanding under the DIP Facility, unless otherwise agreed in writing by the DIP Secured Lender in its sole discretion.

- Entry of an order confirming (or the filing of any motion or pleading requesting confirmation of) a plan of reorganization that does not require the indefeasible

repayment in full, in cash of the DIP Facility as of the effective date of the plan, unless otherwise agreed in writing by the DIP Secured Lender in its sole discretion.

- Appointment of a trustee under Section 1104 of the Bankruptcy Code without the express written consent of the DIP Secured Lender, or the filing of any motion or other pleading requesting such relief which the Debtor fails to timely oppose.

- Appointment of an examiner with expanded or enlarged powers (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code without the prior written consent of the DIP Secured Lender, or the filing of a motion or other pleading requesting such relief which the Debtor fails to timely oppose.

- Entry of an order by the Bankruptcy Court amending, supplementing, staying, vacating or otherwise modifying the DIP Facility, the Interim Order or Final Order approving the DIP Facility, without the prior written consent of the DIP Secured Lender or the filing of a motion or other pleading requesting such relief which the Debtor fails to timely oppose.

- Any attempt by any Debtor to obtain, or if any other party in interest obtains, an order of the Bankruptcy Court or other judgment, and the effect of such order or judgment is to, invalidate, reduce or otherwise impair the claims of the DIP Secured Lender, or to subject any of the collateral of the DIP Secured Lender to a surcharge pursuant to Section 506(c) of the Bankruptcy Code.

- Any Debtor shall request approval of any post-petition financing, other than the DIP Facility, that would not immediately repay all DIP Facility obligations, in full, in cash, on the date of the closing of such post-petition financing.

- Any Debtor shall apply for an order substituting any assets for all or any portion of the DIP Collateral.

- Entry of an order granting liens or claims that are senior or *pari passu* to the liens granted in favor of the DIP Secured Lender under the DIP Financing Documents.

- Any Debtor shall assert that any of the DIP Liens are invalid, or any DIP Liens granted to the DIP Secured Lender shall be determined to be invalid.

- Any payment on, or application by the Debtor for authority to pay any pre-petition claim owing to terminated employees or lease rejection damages without prior written consent of the DIP Secured Lender or as otherwise set forth in the

Budget.

- A final order is entered granting any creditor with a claim in excess of $25,000 relief from the automatic stay.

- Failure to make all payments under the DIP Facility when due.

- Failure to pay any post-petition material indebtedness.

- Breach of any covenant set forth in any DIP Financing Document.

- Any material representation or warranty by any Debtor is incorrect or misleading in any material respect when made.

- Exclusivity shall have been terminated or any Debtor shall have agreed to any such termination.

- Any Debtor shall take (or support any other Person in taking) any action in order to restrict or prohibit the DIP Secured Lender from submitting a "*credit bid*" for any assets of the Debtor.

The commencement of an action or filing of a motion challenging the rights and remedies of the DIP Secured Lender under the DIP Financing Documents or that is otherwise inconsistent with the DIP Financing Documents.

**Indemnification:**

The Debtor hereby indemnifies and holds the DIP Secured Lender, its officers, directors, employees, attorneys, agents, and other representatives (including all of their attorneys and other professionals) (each an "**Indemnified Party**") harmless from and against any and all claims, damages, losses, liabilities and expenses (including, without limitation, all fees and expenses or disbursements to attorneys and other professionals) to which any Indemnified Party may become liable or which may be incurred by or asserted against any Indemnified Party arising out of or relating to or in connection with the DIP Facility, the DIP Financing Documents, or any act, event or transaction related or attendant thereto or any use or intended use of the proceeds of the DIP Facility.

**Governing Law:**

All documentation in connection with the DIP Facility shall be governed by the laws of the state of New York, subject to applicable federal bankruptcy laws.

**Other Definitions:**

"**Approved Budget Compliance Report**" means a current report, in form and substance satisfactory to the DIP Secured Lender, that: (i) details the actual amount of cash receipts and disbursements for the prior week for each line item included in the Budget (on a weekly and cumulative basis), (ii) compares such actual cash receipts and disbursements (on a line item by line item basis) with the weekly and cumulative budgeted amounts for each such line item set forth in the Budget for such period, and (iii) provides an explanation for all variances between budgeted and actual amounts. Each Approved Budget Compliance Report will be certified as true and correct by the Debtor's chief financial officer or chief executive officer.

"**Avoidance Actions**" means any causes of action that could be brought under §§ 544-548 of the Bankruptcy Code or any applicable state fraudulent-transfer statute or similar statute.

"**Avoidance Proceeds**" means the proceeds received from, or property recovered in respect of, Avoidance Actions.

"**Bankruptcy Code**" means Title 11 of the United States Code (11 U.S.C. § 101 et seq.), as amended.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the District of Hawaii presiding over the Chapter 11 Case.

"**Budget**" means the budget of the Debtor relative to the operations of the Debtor in the Chapter 11 Case for any fiscal period, as delivered to the DIP Secured Lender in form and substance satisfactory to the DIP Secured Lender in its sole discretion. The Budget may be amended from time to time as may be agreed to by the DIP Secured Lender, in writing, in its sole discretion.

"**Chapter 11 Case**" means the voluntary Chapter 11 cases commenced by the Debtor in the Bankruptcy Court.

"**Final Order**" means a final, non-appealable order of the Bankruptcy Court, that, without limitation, approves the DIP Facility and grants the liens and security interests contained therein, on terms satisfactory to the DIP Secured Lender in its sole discretion.

"**Interim Order**" means an interim order of the Bankruptcy Court authorizing Debtor, among other things, to obtain interim financing and incur post-petition indebtedness on terms satisfactory to the DIP Secured Lender in its sole discretion.

"**Material Adverse Effect**" means (i) a material adverse change in, or a material adverse effect upon, the operations, business, assets, properties, liabilities (actual or contingent) or condition

(financial or otherwise) of the Debtor as determined by the DIP Secured Lender acting in its sole discretion; (ii) a material impairment of the rights and remedies of any of the DIP Secured Lender under any of the DIP Financing Documents; (iii) a material impairment of the Debtor to perform any of its obligations under the DIP Financing Documents; or (iv) a material adverse effect upon the legality, validity, binding effect, or enforceability against any Debtor of any of the DIP Financing Documents.

"**Maturity Date**" means the date that is ninety (90) days after the Petition Date, or such later date to which the DIP Secured Lender consents in writing.

"**Petition Date**" means the date on which the Chapter 11 Case for the Debtor was commenced.

"**Statutory Committee**" means any statutory committee appointed in the Chapter 11 Case.

"**UST Fees**" means, unpaid, post-petition fees and expenses of the Clerk of the Court and the U.S. Trustee pursuant to 28 U.S.C. § 1930(a) in such amount, with respect to the U.S. Trustee, as agreed to by the U.S. Trustee or as determined by the Court; provided, however, that the UST Fees shall first be paid from any unencumbered funds (if any) available to the Debtor.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their duly authorized officers as of the date first set forth above.

**<u>DEBTOR</u>:**

**WING SPIRIT INC.**

By: _____
Name:
Title:


**<u>DIP SECURED LENDER</u>:**

**HT HOLDINGS CO. LIMITED**

By: _____
Name:
Title: